JOHN W. HARRINGTON, Appellant, v. NATIONAL OUTDOOR ADVERTISING COMPANY, a Corporation, FRANK D. JACKSON, and GENERAL MOTORS CORPORATION, a Corporation.—No. 39405.—196 S. W. (2d) 786.

Division One, September 9, 1946.

Motion for Rehearing or to Transfer to Banc Overruled, October 14, 1946.

*Melvin A. Rogers, Glenn A. Thomas, Calvin & Kimbrell* and *Walter W. Calvin* for appellant.

*John T. Harding, David A. Murphy, R. Carter Tucker* and *John Murphy* for respondent General Motors Corporation; *Leo B. Parker* for respondent Frank D. Jackson; *Alfred D. Hillman* for respondent National Outdoor Advertising Company.

526

VAN OSDOL, C.—Action for $300,000 actual and $900,000 punitive damages for alleged conspiracy of defendants and others to wrongfully procure ▮ the disclosure of and to wrongfully appropriate plaintiff's trade secret or invention. The jury returned a verdict for defendants, and plaintiff has appealed from the ensuing judgment.

It was alleged by plaintiff that defendants, conspiring, induced the disclosure of plaintiff's invention by means of a contract executed March 18, 1936, whereby defendant National Outdoor Advertising Company (in bad faith) undertook to sell a large number of the units of plaintiff's invention to defendant General Motors Corporation (hereinafter referred to as General Motors). It was further alleged that, after the execution of the contract, defendants, pretending plaintiff's invention had been anticipated by others, demanded the reduction of the royalties stipulated in the contract and, upon plaintiff's refusal to agree to the reduction, cancelled the contract, appropriated plaintiff's invention, and procured the issuance of letters patent in the name of defendant Frank D. Jackson. The several separate answers of defendants raised the general issue, specifically

denied plaintiff ever had a trade secret or invention, and alleged the invention had been anticipated by others. In the several answers it was further stated that plaintiff had empowered another to make a sale of the invention; that plaintiff had assigned his property rights in the invention to others; and that he authorized application for letters patent in the name of defendant Jackson.

Plaintiff (appellant) assigns errors of the trial court in the giving of defendants' Instruction E, and in the refusal of plaintiff's Instruction No. 10. Further error of the trial court is assigned by plaintiff in admitting evidence of the proffer of the Jackson patent to plaintiff, and in permitting an offer to auction off or sell the patent to anyone at any price, all of which occurred in the presence of the jury. Defendants (respondents) assert the trial court did not err in the respects contended by plaintiff; and they say plaintiff did not make out a case submissible to a jury.

We will not relate in detail all the evidence as transcribed in the voluminous record; but we will try to set out in detail sufficient of the salient facts to enable a review of the parties' contentions.

Plaintiff at times prior to those herein mentioned had conceived inventions in the science of electricity and had made applications for patents upon his conceived inventions. Some of the inventions were useful and novel. Among other ideas, he had conceived a transformer (afterwards patented), and had assigned percentages of his rights in that invention to James V. Harrington, 15%; W. H. L. Watts, 10%; and W. I. Potter, 10%. Plaintiff had also conceived the idea and had perfected a model of an electric display sign (the invention here in controversy). His transformer was a part of the display sign. The display sign was so devised that it could be illuminated by passing low voltage direct current from an automobile battery through the medium of the transformer and a vibrator into a high voltage alternating current suitable for agitating gases in a gaseous (neon) tube. The tube was so cushioned around the edge of plate glass that it could stand vibration, and was so encased that, when the gases in the tube were agitated, rays of light were projected through the plate glass edgewise ("Edge Light") and were intercepted and refracted by a sandblasted, etched or frosted design on the surface of the glass, thus producing a glowing illumination of the etched design. None of the individual elements, that is, the transformer, the vibrator or the gaseous tube was new or novel. An Edge Light neon sign had been patented by one Kaufman. And James V. Harrington had an application pending for a patent on a cushioned and cased-in neon illuminated glass sign. The James V. Harrington neon sign was an element of plaintiff's display sign. Although plaintiff had an application for a patent (afterwards issued, as stated) of the transformer used in his model sign, a patent on a transformer something like plaintiff's had been issued to one Comstock of the Acme Electric

Company. Any suitable transformer could be used in illuminating plaintiff's display sign. However, the combination of these several elements or units into a portable display sign energized from a storage battery and suitable for use in a moving motor vehicle, motor boat, train or airplane constituted a new combination of the elements, producing a new result—an invention. This is clearly inferred from the fact, shown in evidence, that a patent upon plaintiff's very conception was issued to defendant Jackson, March 2, 1937. It is by no one contended defendant Jackson originally conceived the invention.

(Until late 1936, Chevrolet Motor Company, although a subsidiary of General Motors, had existed as a distinct corporate entity. Late in that year, however, Chevrolet Motor Company was dissolved, its assets and liabilities taken over by General Motors, and Chevrolet automobile and truck sales were thereafter handled by Chevrolet Division, General Motors. The Chevrolet sales department was divided into regions and zones. Walter V. Tomlinson and Wynne Cannon, at St. Louis, were respectively regional and zone managers of Chevrolet truck sales in areas including Missouri. Edward A. Nimnicht, in Detroit, was manager of Chevrolet retail selling department; Edmond Colliau was Nimnicht's assistant; and F. D. McKitrick was assistant manager of the commercial car department at Detroit. Walker & Company, a Michigan corporation, whose principal business is advertising, was a source from which General Motors' dealers procured their advertising media; the advertising materials were sold by Walker & Company directly to dealers, General Motors having "sponsored" the advertising before sales thereof were solicited. Burton C. Wilson represented Walker & Company in "sales contract work." Defendant National Outdoor Advertising Company, hereinafter referred to as Advertising Company, was a Missouri corporation of which defendant Jackson was president, and Alfred D. Hillman, secretary-treasurer and attorney.)

Early in 1936, plaintiff had placed his sign model in the offices of his attorneys, Watts and Potter, Kansas City; and Hillman and Jackson were introduced to plaintiff and saw his model sign. Tomlinson had known Jackson for twelve years or more, and had consulted with him frequently concerning sales promotional ideas. Jackson introduced Tomlinson to Hillman; and Tomlinson was introduced by Hillman to plaintiff and saw the model sign. After these examinations of the model, request was made of plaintiff for a road test of his sign; the request was refused "until there was a proper contract drawn to protect us from disclosure of this model." He was asked to make an offer of terms by which Advertising Company could become the licensee for the sale of the sign, and March 12th an offer was made by plaintiff and by James V. Harrington, W. H. L. Watts and W. I. Potter to Advertising Company stating the terms and conditions whereby Advertising Company could become a licensee to sell the sign

at a stipulated royalty of $1.50 to the offerers for the use of the combined units, that is, plaintiff's transformer and James V. Harrington's Edge Light sign, as combined in plaintiff's invention. The offer was in part as follows,

"This letter is pursuant to the negotiations had with you . . . relating to what we discussed as the Harrington Unit and also to the Harrington Display sign . . . and is a binding offer to you of an exclusive license to make use and vend for advertising purposes only the electrical unit or units invented by John W. Harrington designed to furnish energy for illuminating purposes, from a storage battery; said invention being fully described . . . in applications for letters patent now pending . . . and to the invention of James V. Harrington described in a patent application . . . in his name, and relating to sign structures and signs illuminated through the employment of luminous tubes with new and novel means for holding the luminous tube of the sign in operative position . . . the license is to run to . . . Advertising Company . . . on the representations made to us by you that said corporation is in a position to obtain, through the good will, agencies and subsidiaries of the General Motors . . . the sale of a large number of said units and display signs . . ."

The offer became effective by acceptance by Advertising Company with modifications approved by plaintiff, and by James V. Harrington, Watts and Potter, March 18, 1936. Road tests of the sign were made during the next few weeks by Cannon and Tomlinson. Cannon testified, "Tomlinson asked me did I know who was a good patent lawyer . . . I think it was Tomlinson or Jackson . . . I told them about a lawyer that was in Akron . . ." The lawyer referred to was J. Ralph Barrow, patent attorney of Akron, Ohio, mentioned infra. McKitrick, passing through Kansas City, April 25th, met Hillman, Jackson and Tomlinson and was shown the sign in position in an automobile.

In June 1936, Hillman was introduced to Nimnicht by McKitrick at General Motors' offices in Detroit, and the model sign was there shown to Nimnicht, who was interested, and Wilson of Walker & Company was called into the conference. Wilson undertook to determine the cost of manufacturing the sign with the view of sales by Walker & Company to General Motors' dealers. Upon his return to Kansas City, Hillman reported, "the trip (to Detroit) was very satisfactory; that is . . . they (General Motors) were interested." Just prior to July 13th, there were discussions concerning "beating the royalty down," the plaintiff, defendant Jackson, Hillman, Watts, Potter and Tomlinson being present. Plaintiff "refused to disturb the contract in any manner," whereupon Hillman remarked, "Well, we will cancel it in its entirety." And by letter written by Hillman, July 13, 1936, plaintiff, and James V. Harrington, Watts and Potter were told that

531

"it now appears to us that there is no adequate coverage in either of said patent applications which would permit us to manufacture the articles contemplated . . . this letter will serve as a cancellation of said contract . . . in its entirety." July 1, 1936, Walker & Company had written Hillman, "We have been discussing with Chevrolet the Edge Light type of sign . . . and it appears that the possibility of their adopting this for 1937 is very good. However, in view of all of the various patent complications which have been brought to their attention they are very reluctant to make a definite commitment . . ." But, on July 3, 1936, Hillman had written Walker & Company that he had been doing considerable work "on the patent situation and only recently determined in my own mind just where we stood." July 8th Hillman met Colliau of General Motors at Cleveland, and discussed the Comstock patent with representatives of Acme Electric Company. It was arranged that the transformer patented by Comstock and manufactured by Acme Electric Company would be used in the manufacture of the sign instead of the transformer invented by plaintiff. It was proposed by Walker & Company that 30¢ per sign should be the compensation in royalties for the sale privilege, and July 16th Hillman wrote Walker & Company, "as you say, you think 30¢ per unit is fair compensation to us, we will take your judgment on the matter and accept the 30¢." Subsequently, Walker & Company received a commitment of General Motors guaranteeing the sale of 2500 units to General Motors' dealers. Walker & Company began manufacturing the sign in October 1936, and there were thereafter sold to Chevrolet dealers 6812 signs for $97,071 upon which sales Walker & Company paid Hillman $2,043.60.

Since May 26, 1936, Hillman had known plaintiff's idea was possibly patentable, inasmuch as he had received a report from J. Ralph Barrow stating there was "at least an even chance on covering (by patent) the combination of an edge-illuminating panel with a neon type of tube, as the panel of an automobile body, which apparently no one has ever done before, using the generator of the motor and storage battery as the source of electricity for operating the panel." October 24, 1936, Hillman wrote Barrow, "I am in receipt of your letter of October 21 enclosing the Jackson application on vehicle advertising, which I had Mr. Jackson execute and which I enclose herewith . . . I hope you are able to secure a patent on it." As stated, a patent was issued to defendant Jackson, March 2, 1937.

Plaintiff denied that he had ever authorized anyone to accept a lesser sum per sign in royalties than was provided in the contract of March 18th. He stated he had not accepted any sum from Hillman in payment of a share of the 30¢ royalties on the signs actually sold. He disputed the authenticity of an endorsement of his purported signature upon a cancelled check payable to him in an amount equal to a share of the royalties upon the combination units sold; he

denied having authorized an application for a patent by defendant Jackson; and testified he had not sanctioned and was in no way a party to any transaction negotiated or consummated by Hillman at any time subsequent to the cancellation of the contract of March 18th.

From these facts it has been observed that, prior to March 18, 1936, plaintiff had conceived a new idea; he had combined old or known elements into a new combination producing a new and useful result, an invention—an invention which, though patentable, he had not patented. He had a property right in his unpatented invention. Plaintiff's unpatented invention was not unlike a trade secret, the protection of which secret, although the secret may or may not be patentable, the law will afford to the originator, until he has made an unrestricted disclosure. Plaintiff's invention was disclosed through the contract of March 18th, to which plaintiff's assignees James V. Harrington, Watts and Potter were parties. The contract was cancelled. But the contract and its cancellation did not extinguish plaintiff's right in his trade secret or invention so as to give defendants the right to appropriate and to vend or use the invention if they procured the disclosure of the invention by improper means. 22 R. C. L., Property, secs. 14 and 15, pp. 45-47; Vol. IV, Restatement of the Law of Torts, sec. 757, pp. 1-17; Becher v. Contoure Laboratories, 279 U. S. 388, 49 S. Ct. 356; American Dirigold Corp. v. Dirigold Metals Corp., 125 F. 2d 446; Allen-Qualley Co. v. Shellmar Products Co., 31 F. 2d 293; Germo Mfg. Co. v. Combs, 209 Mo. App. 651, 240 S. W. 872.

The issues of the alleged wrongful conspiracy and the issue of resultant damages were submitted to the jury by the trial court, and, as we have said, the jury returned a verdict for defendants. We have stated facts from a standpoint favorable to plaintiff. Now assuming, without deciding, the facts related are sufficient to support the submission of the issues of the alleged wrongful conspiracy (and as to all of the defendants) to the jury, the jury's verdict should not be disturbed except it be that the trial court erred, as plaintiff contends, in the giving and refusal of instructions, and in permitting the proffer of (and the examination of witnesses relating to) the Jackson patent. In examining these contentions of plaintiff, we will note the effect of some of the evidence introduced by defendants in order that we may ascertain what pleaded issues were actual; and we will endeavor to keep in mind the nature of the action. It is here summarily stated that evidence was introduced by defendants, and elicited on cross-examination of plaintiff's witnesses, tending to negative the alleged conspiracy and tending to show that plaintiff was at all times fully advised and consented to all of the negotiations carried on and consummated by and among Hillman and defendants and others before and after the cancellation of the contract of March

18th; that plaintiff authorized and knowingly received his share of the reduced royalties upon the signs sold; and that plaintiff tacitly approved the application for the patent in the name of Jackson. Defendant also introduced evidence tending to prove that plaintiff's invention was not commercially successful; that, while Walker & Company had sold, under the sponsorship of General Motors, 6812 signs to Chevrolet dealers in late 1936 and early 1937, no signs could thereafter be sold; that the dealers to whom the signs were sold did not find the sign practicable or useful, "dealers said it was a washout"; and that, after a brief trial by the purchasing dealers, the signs sold were put aside and not thereafter used. This is not an action for the infringement of a patent, nor an action to determine title to a patent. And the case is broadly distinguished from an interference proceeding before the Commissioner of Patents whereby plaintiff might have procured a patent on his invention, notwithstanding the issuance of defendant Jackson's patent. See 35 U. S. C. A. sec. 52, p. 131; 35 U. S. C. A. sec. 31, p. 17, and as in effect prior to the Amendment of August 1939; and Nolop v. Smith, 36 F. 2d 838. The instant ▮ action is on the case—conspiracy to wrongfully procure the disclosure of and to wrongfully appropriate plaintiff's unpatented invention. It has been noticed that the issues supporting plaintiff's claim, namely, the issue of the conspiracy, the issues of the improper or wrongful procurance of disclosure and the appropriation, and the issue of resultant injury and damages were actually contested issues in the trial of the cause. The facts of the application for the patent and the validity of the Jackson patent were not in issue and were not essential to the maintenance of plaintiff's claim. But the Jackson application for a patent was a material evidentiary fact tending to demonstrate defendants had appropriated plaintiff's unpatented invention. Having a regard for these observations distinguishing between the issues supporting plaintiff's claim, and an evidentiary fact material to an issue, plaintiff's contentions of error are now examined. .

▮ Instruction No. 10 tendered by plaintiff and refused by the trial court is as follows,

"You are also further instructed that where an application for a patent, upon any invention or device, is made by someone other than the original inventor thereof, that such patent, if obtained upon the application and oath of one who is not the original inventor thereof, would be unauthorized by law, and, therefore, void and illegal; and, therefore, in this same connection, you are further instructed that if you should believe and find, from the evidence, that the defendant, Frank D. Jackson, was not the original inventor of the invention referred to and described in his application for and in the patent, in evidence before you herein, and which was issued to him upon his aforesaid application therefor, then you are further instructed that said patent, so procured by the defendant, Frank D. Jackson, as

aforesaid, was, and is, futile, invalid and void, and confers no rights in his favor as against the public, to any person, firm or corporation, to whom, or to which, he might assign the same."

Given Instruction E tendered by defendants is as follows,

"The Court instructs the jury that if you find and believe from the evidence that the plaintiff, in November or December of 1935 . . . conceived an invention or trade secret consisting of a combination of a transformer and edge light sign illuminated by a neon tube for use in motor or other vehicles for advertising purposes, and energized by a low voltage battery or generator therein . . . and if you further find that by wrongful means, the defendants, or any of them, in March, 1936 . . . obtained a disclosure from plaintiff of his alleged invention or trade secret . . . plaintiff nevertheless had the duty to exercise reasonable diligence after such disclosure . . . to protect his alleged invention or trade secret by applying for a patent thereon, and if you find that plaintiff did not exercise reasonable diligence to protect his alleged invention or trade secret by applying for a patent thereon . . . then plaintiff lost all property rights in said alleged invention or trade secret and the same became the property of the world, and your verdict, if you find a verdict against any of the defendants, cannot be in an amount in excess of one cent."

Concerning Instruction No. 10 we believe it was not error to refuse the instruction. Again we remark the validity of the Jackson patent was not an issue. The giving of the instruction could have confused the real issue. On the other hand, the giving of the instruction might not have been error for the reason such a given instruction would indicate a trial court's view that it was necessary for the jury to be cautioned against putting undue significance upon the fact that a patent had been issued to defendant Jackson. But the giving or refusal of a cautionary instruction is largely within the discretion of a trial court. Lewis v. Zagata, 350 Mo. 446, 166 S. W. 2d 541.

■ The testimony of the proffer of the Jackson patent to plaintiff was introduced on cross-examination of Hillman by counsel for defendant ■ Jackson. No appropriate objection was interposed by plaintiff. Plaintiff was asked on cross-examination if he had instituted proceedings to invalidate the patent. We believe there was no real impropriety in such an inquiry. Plaintiff had shown in evidence and emphasized the fact that a patent had been issued upon the Jackson application. It could be considered reasonable that complacency of plaintiff in the face of knowledge of the issuance of the Jackson patent was corroborative of defendants' evidence that plaintiff had approved the patent application in the name of Jackson. The offer to sell the patent at any price occurred during defendants' cross-examination of plaintiff's witness Neal. Plaintiff sought to show the extent of his damages by this witness' estimates of future sales of plaintiff's invention patented by Jackson, although it is noted that

plaintiff considered the patent void (see plaintiff's proffered Instruction No. 10, supra). In examining the witness Neal, upon the question of plaintiff's damages, plaintiff's counsel assumed ''a patent was procured upon that combination,'' and Neal's estimates of damage to plaintiff were made on the hypothesis plaintiff's invention had proved successful commercially and was protected by a valid patent. On cross-examination, the witness Neal was reluctant to make estimates without considering the value of a valid patent. It was not unfair to plaintiff and fair to defendants in such a situation to permit defendants to eliminate the witness' consideration of the patent and its value, and to ascertain the witness' estimates of what the damage would be if based upon defendants' evidence tending to show the invention had proved unsuccessful in commercial sales; and defendants were entitled to the witness' answer without his giving a regard to the fact of a patent. Of course, if plaintiff's invention were worthless commercially, its value was not enhanced by the patent. Moreover, the testimony relating to the proffer of and the offer to sell the patent, if erroneously admitted, was not, in our opinion, prejudicial to plaintiff in view of the verdict for defendants. The jury must have found either that no right of plaintiff had been wrongfully invaded, or that he was not damaged thereby, else the jury would have found for plaintiff and awarded at least nominal damages. And the same may be said of defendants' given Instruction E.

Instruction E was erroneous in engrafting a false issue, lack of diligence of plaintiff in protecting his invention, upon the issue of damages; and the instruction may have been otherwise erroneous (see Sec. 52, 35 U. S. C. A., supra, and Nolop v. Smith, supra). But we believe the error was not prejudicial to plaintiff, inasmuch as the jury found against plaintiff. The jurors reached no stage in their deliberations to which the instruction was applicable. Had the jury returned a verdict for plaintiff, awarding damages in a nominal sum, and if complaint were here made that the nominal award was inadequate, then the question whether the erroneous instruction was prejudicial to plaintiff would be vital indeed. The instruction limited the amount of the jury's award upon a finding for plaintiff upon the issues of the alleged wrongful conspiracy and is analagous to an erroneous instruction, given at the behest of a defendant, upon the measure of damages, where the jury has found against plaintiff on the ultimate question of liability. Examine Carlisle v. Tilghmon, Mo. Sup., 174 S. W. 2d 798; Mendenhall v. Neyer, 347 Mo. 881, 149 S. W. 2d 366; Oliver v. Morgan, Mo. Sup., 73 S. W. 2d 993; Gricus v. United Rys. Co. of St. Louis, 291 Mo. 582, 237 S. W. 763.

The judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.