JAMES R. TATUM, Plaintiff-Respondent, v. GULF, MOBILE & OHIO RAILROAD COMPANY, a Corporation, Defendant-Appellant, No. 41036 —223 S. W. (2d) 418.

Division Two, September 20, 1949.

Motion for Rehearing or to Transfer to Banc Overruled, October 10, 1949.

*Wayne Ely, Robert C. Ely* and *Ernest D. Grinnell, Jr.*, for appellant; *D. S. Wright* of counsel.

712

*Mark D. Eagleton* and *Wm. H. Allen* for respondent.

714

716

LEEDY, J.—Action under the Federal Employers' Liability Act, 45 U. S. C. A., § 51 et seq., for personal injuries. Verdict for plaintiff for $50,000, and from the judgment thereon the railroad appeals. Plaintiff was injured while employed by defendant in interstate commerce as rear brakeman or flagman on a south-bound freight train being operated between Tamms, Illinois, and Jackson, Tennessee. He was injured when he alighted in the nighttime from the caboose which had been stopped on a bridge or trestle at Winford Junction, Kentucky, missed his footing, and fell 34 feet to the creek below.

The petition contained numerous charges of negligence, including that of failure to provide plaintiff with a reasonably safe place to work. The answer denied that plaintiff was injured as a result of any negligence or carelessness on defendant's part, and averred that

whatever injuries he suffered resulted solely and alone from his own carelessness and negligence. The answer also pleaded contributory negligence on plaintiff's part. Other charges having been abandoned, submission was under plaintiff's charge that defendant failed to exercise ordinary care to furnish him a reasonably safe place to work in these particulars: Stopping the train with the caboose over the trestle, and failure to build a walking platform or to build a guard-rail so as to afford a place to stand or walk. On this appeal defendant assigns error in the following: (1) Denial of its motion for a directed verdict; (2) Certain rulings respecting the testimony of plaintiff's witness Feuchter; (3) Giving of plaintiff's instruction No. 1; (4) Refusal of requested instructions B, C, and D; and (5) the amount of the verdict.

Winford Junction is the point at which defendant's line connects with the double-track main line of the Illinois Central whereon the accident occurred. The trestle from which plaintiff fell is a part of that double-track main line, and it lies generally in a north-south direction. Its total length is 824 feet. The switch tower is 2119 feet south of the south end of the trestle. It is the only building of any kind at Winford Junction, and is on the east side of defendant's main line something over 200 feet south of the switch. As defendant's track leaves the Illinois Central's, it curves off somewhat to the west.

The freight train in question was south bound, and, consequently, on the westernmost of the double tracks as it pulled into Winford Junction about 9 P. M., on February 21, 1947. The train consisted of two Diesel engines, 62 freight cars (averaging 48 feet in length) and a caboose. Plaintiff was riding in the caboose, engaged in making out a wheel report when "the brakes went into emergency," and this was his first knowledge that the train was about to stop, although he had previous notice that it would stop that night at Winford Junction "to pick up Mr. Hancock." Plaintiff remained seated until the train stopped. He then got up, got a fusee, two torpedoes, and his lantern, and went out the back door and onto the platform, preparatory to protecting the rear of the train by flagging, as was his duty under defendant's rule 99;[1] however, before ▮▮▮ plaintiff had actually gotten down, the engineer signalled to him "to go flag"—one long and three shorts, which meant "right now." There was nobody on the platform with him; he turned on his lantern and started to descend on the west or right side of the caboose; as he did so he carried the lantern in his left hand, and held onto the grab iron with his right;

---

[1] "99. When a train stops under circumstances in which it may be overtaken by another train, the flagman must go back immediately with flagman's signals a sufficient distance to insure full protection, placing two torpedoes, and when necessary, in addition, displaying lighted fusees. When recalled, or relieved by another flagman, and safety to the train will permit, he may return."

he did not know he was on the trestle; it was "dark as pitch" and "wasn't raining." Standing with both feet on the bottom step, facing west, he "shined the lantern at the steps and saw rock there. I shined it out further and saw more rock. I thought it was 3 or 4 feet wide." On cross-examination plaintiff stated that in swinging his lantern out to see what was below, he saw rock, and "they naturally looked kind of white," and he thought he saw the rock extending out 4 or 5 feet from the side of the caboose. The lantern did not disclose the fact he was on the trestle, and when he stepped off the bottom step after making the examination, he scraped the edge of the trestle, and fell to the creek 34 feet below.

The trestle is 824 feet in length, and is made up of three distinct sections. The center section is the bridge proper, 126 feet in length, having only ties beneath the rails, except an area about 6 feet wide between the north and south-bound tracks which is ballasted. The entire distance between the two sets of tracks is 11 feet, 3 inches. The north and south sections of the trestle are, respectively, 507 and 191 feet in length. Both of these sections are rock filled with the top ballasted with white crushed rock. The accident occurred about 100 feet north of the south end of the south section. At this point, as along the entire length of the rock-filled portions, the distance from the inside of the west rail of the south-bound track to the west edge or "drop off" of the trestle is 54 inches; from the outside edge of that rail to the same point, 51 inches; beyond the trestle, both north and south, there is an 84-inch shoulder outside of the western rail. The caboose has 3 steps, "about a foot apart." The bottom step is approximately 2 feet above the rail. According to plaintiff's evidence, the overhang is such as to leave only 2 to 2½ feet from the west edge of the bottom caboose step to the west edge of the trestle. (Defendant's assistant bridge foreman testified he measured that distance by the use of a plumb bob and rule, and found it to be 32 inches.) There was no catwalk, platform or guardrail on the trestle where plaintiff undertook to alight. The photographs show a ballasted platform (with guardrail) about 10 feet long and extending out from the trestle about 6 feet on the east side of the south section of the trestle. The plaintiff testified he descended on the west or right side because he had been taught to get off on the right side of a train so as to work on the engineer's side, and in order to give the engineer a chance to see him. On cross-examination he said that everybody taught him to get off on the right side from the time he started railroading; that flagmen work on the engineer's side; that he works on the engineer's side so as to get off where he can be seen by the engineer. In this connection he introduced rule 7 (a).[2]

---

[2]"7 (a). Signals must be given and acted upon strictly in accordance with the rules. Trainmen, yardmen, enginemen and others must keep a constant lookout for signals. Those giving signals must locate themselves so as to be plainly seen; signals must be given in such a manner that they can be definitely understood."

Did the evidence make it a jury question as to whether defendant negligently breached its duty to furnish plaintiff with a reasonably safe place to work? Defendant takes the position, and asks this court to declare as a matter of law, that it met its full duty in the respect mentioned by providing at the place in question a rock-ballasted trestle the deck of which extended 32 inches beyond the caboose steps on the west side, and something over 15 feet beyond the caboose steps on the other side, but which did not have a catwalk, platform or guardrail. The question is to be approached in the light of those recent decisions of the Supreme Court of the United States in FELA cases as thus referred to in Louisville & N. R. Co. v. Botts, 173 Fed. 2d 164, 167: "The opinions of the Supreme Court have declared that it is 'the clear Congressional intent that, to the maximum extent proper, questions in actions arising under the Act should be left to the jury,' Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54, 68, 63 S. Ct. 444, 451, footnote 30, 87 L. Ed. 610, 143 A. L. R. 967; that such cases may not be taken from the jury merely because the question of liability is 'close or doubtful,' Bailey v. Central Vermont Ry., 319 U. S. 350, 354, 63 S. Ct. 1062, 1064, 87 L. Ed. 1444; that the jury has the right to make 'all reasonably possible inferences' from such probative facts in the evidence as it chooses to accept, and 'It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences,' Tennant v. Peoria & P. U. Ry. Co., 321 U. S. 29, 32-35, 64 S. Ct. 409, 411, 412, 88 L. Ed. 520; that in any choice between possible inference 'a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference,' but 'Only when there is a complete absence of probative facts to support the conclusion reached does reversible error appear,' Lavender v. Kurn, 327 U. S. 645, 653, 66 S. Ct. 740, 744, 90 L. Ed. 916; and that the assumption that, on an issue of liability, 'juries will invariably decide . . . against railroads' is 'contrary to fact,' and courts may not act on the theory that 'juries will fall short of a fair performance of their constitutional function,' but they must assume that a jury 'finds facts only because they are proved.' Wilkerson v. McCarthy, 69 S. Ct. 413, 417, 418."

The three authorities cited first by defendant, and therefore, under rule 1.08, principally relied on by it, are: B. & O. R. R. Co. v. Berry, 286 U. S. 272, 52 S. Ct. 510, 76 L. Ed. 1098, reversing Berry v. B. & O. R. R. Co., (Mo.) 43 S. W. 2d 782; Cawman v. Pennsylvania-Reading Seashore Lines, 110 Fed. 2d 832, certiorari denied, 311 U. S. 666, 61 S. Ct. 24, 85 L. Ed. 427; and Bailey v. Central Vermont Ry., 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444.

Plaintiff, contending the question was clearly one for the jury, similarly relies on the same Cawman and Bailey cases, and Pauly v. McCarthy, 330 U. S. 802, 67 S. Ct. 962, 91 L. Ed. 1261, reversing, on certiorari, Pauly v. McCarthy, et al., Trustees, (Supreme Court of Utah), 166 P. 2d 501.

In the Cawman case, plaintiff's decedent, an experienced railroad brakeman, was killed when he stepped from the steps of his caboose which projected into space when the caboose was stopped at night on a trestle. The trial court, upon the authority of B. & O. R., R. Co. v. Berry, supra, directed a verdict for defendant. Judgment reversed and new trial granted on appeal to the Circuit Court of Appeals, Third Circuit, where it was held that whether the failure of the railroad to place a light, guardrail or catwalk on the trestle was a breach of its obligation to provide plaintiff a safe place to work was for the jury. (110 Fed. 2d 832.) B. & O. R. R. Co. v. Berry, supra, was distinguished, the court saying [1. c. 834]: "The theory of the Berry case is negligence of personnel. There is no mention in either opinion of failure of materiel. In the case at bar, there is such mention and in, so to speak, full bodied terms. The trestle from which the plaintiff's intestate fell was that and nothing more. There was no light, guardrail, or catwalk for the protection of those whose duties might require their physical presence on the non-existent flooring. We think this omission may constitute a breach of the conceded obligation to provide a safe place to work. The cases are collected in 45 U. S. C. A. § 51, note 289, p. 185, (1939 Supp.) p. 49. That obligation assumes as many forms as there are places to work. The citation of authority, except by way of analogy, is not, therefore, profitable." Even if the authority of the Berry case has not been destroyed by the later decisions of the Supreme Court to which we have referred, we think the ground on which it was distinguished in the Cawman case is valid, and that, for the same reason, it is not controlling here.

In Bailey v. Central Vermont Ry., supra, plaintiff's decedent was a section hand whose death resulted from injuries sustained when he fell 18 feet from a dry bridge to a crossing below while opening the hopper of a car loaded with cinders (spotted on the bridge) to be dumped through the railroad ties onto the roadway below. The available footing extended about 12 inches beyond the outside of the car. Judgment for plaintiff was reversed by the Supreme Court of Vermont (113 Vt. 8, 28 A. 2d 639), the court holding a directed verdict should have been granted because negligence on the part of the railroad was not shown. On certiorari, the Supreme Court of the United States reversed, holding that there was sufficient evidence to go to the jury on the question of whether the railroad was negligent in failing to use reasonable care in furnishing Bailey with a

safe place to work. In so doing, the court said: "Sec. 1 of the Act makes the carrier liable in damages for any injury or death 'resulting in whole or in part from the negligence' of any of its 'officers, agents, or employees'. The rights which the Act creates are federal rights protected by federal rather than local rules of law. (Citing cases.) And those federal rules have been largely fashioned from the common law . . . except as Congress has written into the Act different standards. Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54, 63 S. Ct. 444, 87 L. Ed. [610]. At common law the duty of the employer to use reasonable care in furnishing his employees with a safe place to work was plain. 3 Labatt, Master & Servant (2d ed.) § 917. That rule is deeply engrained in federal jurisprudence. Patton v. Texas & P. Ry Co., 179 U. S. 658, 664, 21 S. Ct. 275, 277, 45 L. Ed. 361, and cases cited; Kreigh v. Westinghouse, C., K. & Co., 214 U. S. 249, 256, 257, 29 S. Ct. 619, 621, 622, 53 L. Ed. 984; Kenmont Coal Co. v. Patton, 6 Cir., 268 F. 334, 336. As stated by this Court in the Patton case it is a duty which becomes 'more imperative' as the risk increases. 'Reasonable care becomes, then, a demand of higher supremacy, and yet, in all cases it is a question of the reasonableness of the care, reasonableness depending upon the danger attending the place or the machinery.' 179 U. S. page 664, 21 S. Ct. page 278, 45 L. Ed. 361. It is that rule which obtains under the Employers' Liability Act. See Coal & Coke Ry. Co. v. Deal, 4 Cir., 231 F. 604; Northwestern Pac. R. Co. v. Fielder, 9 Cir., 52 F. 2d 400; Thomson v. Boles, 8 Cir., 123 F. 2d 487; 2 Roberts, Federal Liabilities of Carriers (2d ed.) § 807. That duty of the carrier is a 'continuing one' (Kreigh v. Westinghouse, C., K. & Co., supra, 214 U. S. page 256, 29 S. Ct. page 622, 53 L. Ed. 984) from which the carrier is not relieved by the fact that the employee's work at the place in question is fleeting or infrequent." See, also, Bly v. Southern Ry. Co., 183 Va. 162, 172 A. L. R. 584; Ellis v. Union Pac. R. R. Co., 329 U. S. 629, 67 S. Ct. 598, 91 L. Ed. 572.

We hold that, under the evidence and the authorities above cited, the question of whether the railroad was negligent in failing to furnish plaintiff with a reasonably safe place to work was for the jury.

 Defendant also contends that a verdict should have been directed for it because the evidence shows that plaintiff's injuries resulted solely from his own negligence and carelessness in failing to properly appraise the situation with which he was faced. It is true that plaintiff testified that the reason he fell was because it looked like, or he thought, there was about 3 or 4 feet of gravel; and that if he had known he was on a trestle, he could have held on until he got back behind the caboose. Obviously, it does not appear as a matter of law that the sole proximate cause of plaintiff's injuries was his own negligence, and so the question was one for the jury.

Plaintiff's witness Feuchter had examined the trestle, and made photographs of it which were in evidence. He was permitted to testify as an expert that from the standpoint of practical engi- [424] there was nothing to prevent extending the trestle, or putting catwalks or guardrails along its sides, and that to do so would not interfere with the operation of the railroad. The witness, a consulting engineer since 1924, was a graduate of Cooper Institute of Technology of New York City; he had been employed in an engineering capacity for several years by a firm of St. Louis consulting engineers; he had been Traffic Engineer for the City of St. Louis for seven years before going into military service in 1942; he served as an engineer overseas. The witness testified he was experienced as a structural engineer; that he was not a railroad engineer; that his only experience in railroading was "in structural construction of railroad coal hoppers for unloading coal, and switch tracks" in yards of plants designed in part by him, but that he had had nothing to do with the construction of trestles or bridges for railroads. Defendant contends that these admissions so completely disqualified the witness that allowing him to testify amounted to an abuse of the trial court's discretion, and, therefore, reversible error. We do not agree. We think the matter of the feasibility of extending the trestle by the construction of catwalks or guardrails was not exclusively within the knowledge of an engineer experienced in railroad construction, and in view of the admitted training and experience of this witness as a structural engineer, we hold the court did not err in overruling defendant's objections to his qualifications as an expert.

It is next urged that it was error to permit Feuchter to testify to the effect that there was no artificial illumination—"flood lights or any type of light—that would illuminate the west side of the trestle." The question eliciting this reply was objected to because "it assumed there should be illumination" and because there was no allegation in the petition that would justify the question. Defendant also complains, on substantially the same grounds, that the court refused to strike that portion of Feuchter's testimony describing the switchman's lantern (which had been introduced in evidence) wherein he stated it had no "optical unit, no reflector, or no lens," and that, as compared with the ordinary flashlight, this one was "more like a match . . . it can be seen in the distance, but there is no reflector behind it." It is true the petition did not charge negligence in failing to illuminate the trestle, but defendant's answer did set up that plaintiff's injuries resulted solely from his own negligence, and also a plea of contributory negligence. It is manifest that on these issues it was competent to show the circumstances under which plaintiff's duties required him to alight from the caboose on the trestle, which included the fact of darkness. Nor

do we think, as defendant contends, that the "disparaging remarks regarding the lantern injected into the case and into the minds of the jury a duty which had not been pleaded."

▮ Defendant complains that the court erred in excluding its offer of proof (as•to the witness Feuchter) in regard to the custom of building catwalks and·guardrails on trestles in "open country." The offer arose on cross-examination of the witness, and the matter covers several pages of the transcript. It is difficult to piece together the running fire of exchanges between counsel and to determine the precise offer finally made, in view of tentative offers to accept several suggested amendments. As nearly as we are able to determine the matter, the offer was that the witness would testify that "where there is no working conditions for the man these are not found. In other words, if the man is not required to do work around there then guardrails and walks would not be necessary on trestles." The offer was denied, which was bound to have been harmless, even if error, because of these questions and answers thereafter developed on cross-examination of this witness by defendant's counsel:

"Q Do you know anything about good railroading practice with reference to the constructing of catwalks on trestles?

A No.

\* \* \* \* \* \* \* \*

Q Do you know anything about good railroading practice with reference to the ▮ placing of guardrails on trestles in open country, such as this trestle was in?

A No, sir.

\* \* \* \* \* \* \* \*

Q Have you ever seen any guardrails on any trestle in open country where no work was to be performed by railroad men?

A No, sir.

Q Have you ever seen a catwalk on a trestle in open country where no work was to be regularly performed by the railroad men?

A No, sir."

▮ Defendant's refused instruction B sought to withdraw plaintiff's charges that the defendant negligently caused and permitted the train to be stopped so that the caboose was immediately over a trestle or bridge spanning a creek, and that defendant negligently failed to stop the train at a place where the caboose would not be immediately over said bridge. In support of its position that it was error to refuse the instruction, we are cited to Berry v. B. & O. R. R. Co., 43 S. W. 2d 782. Plaintiff says these charges were abandoned by him in submitting the case to the jury, so that the refusal of an instruction withdrawing abandoned charges in the petition was a matter within the discretion of the trial court. However, we do not

so understand the record, because plaintiff's instruction No. 1 submitted the hypothesis, among others, that ''defendant stopped its train so that the caboose in which plaintiff was riding was immediately over a trestle spanning a creek, the bottom of which was some thirty-four feet below,'' and required a finding that by reason of that fact, among others, ''said place on said trestle was dangerous and unsafe and not a reasonably safe place in which to work, . . . and that in thus furnishing said place for plaintiff to work . . . the defendant did fail to exercise ordinary care and was guilty of negligence, etc.'' Defendant makes no attack on this portion of instruction No. 1. The answer to defendant's contention is this: Unlike the case at bar, the negligence charged in the Berry case was not that the bridge was not a reasonably safe place to work, but that the railroad was negligent in stopping the caboose of a 42-car train on a trestle only 40 feet long, and in that the conductor directed or permitted the plaintiff to alight there. This distinction was pointed out in Pauly v. McCarthy, 166 P. 2d 501, where the Supreme Court of Utah declined to rest the decision in that case on the authority of the Berry case.

We find no evidence that it was plaintiff's duty to exercise his own judgment as to which side of the caboose he would alight from. His undisputed testimony was to the effect that it was his duty to alight from the right or west side of the caboose. Consequently, defendant was not entitled to instruction C, which told the jury that if plaintiff could have alighted from the east side of the caboose with safety, and without any danger of falling from the trestle, *and if it was his duty to exercise his own judgment as to which side he would alight from,* and that he negligently alighted from the west side, and that such negligence was the sole cause of his injuries, the verdict should be for the defendant.

In this connection we treat the assignment that it was error to refuse defendant's instruction D, which told the jury: ''The Court instructs the jury that there has been some testimony in the case with reference to the amount of light that was given by the lantern which plaintiff had at the time of the occurrence complained of. In this connection you are instructed that plaintiff does not complain that defendant failed to furnish him with a proper and adequate lantern, and you cannot return a verdict for plaintiff on such ground.'' We agree with plaintiff that the jury did not need to be told that they could not return a verdict for plaintiff on a ground not mentioned in the instructions given them. The giving or refusal of cautionary instructions is a matter resting in the discretion of the trial court. Harrington v. National Outdoor Advertising Co., 355 Mo. 524, 196 S. W. 2d 786.

Instruction No. 1 is assailed as permitting the jury to find that the trestle was ''dangerous and unsafe and not a reasonably

safe place to work'' if, among other things, the jury should ''further find and believe that at said time and place it was dark and in the night time.'' Defendant contends that ''dark'' refers to the testimony regarding lack of floodlights, and, therefore, that the instruction assumes there was a duty to illuminate, and authorizes the jury to find that the failure to illuminate was a breach of defendant's duty when no such charge of negligence had been made. What was said respecting the admission of the testimony of the witness Feuchter touching artificial illumination fully answers the question here presented.

A more troublesome question is presented with reference to the amount of the verdict. Plaintiff was injured February 21, 1947; his age, 52; earnings, $300 per month (15-½% increase to men in his type of service effective January 1, 1948.) His fall rendered him unconscious for 30 or 40 minutes, and then he was taken from Winford Junction to a hospital in Cairo, Illinois, before being transferred to the Missouri Pacific Hospital in St. Louis. He was hospitalized one month and twenty-seven days. From a notation on his hospital chart it appears that he returned there as an outpatient on May 20, 1947, and was directed to return in one month; however, there is nothing in the record to indicate he ever returned.

Plaintiff testified that his pelvis was broken ''in four or five places,'' and his spine bent or fractured. Previously he had had no difficulty with his spine or pelvis, but that in October, 1945, he suffered an injury to his left knee, necessitating absence from work for six months; that he returned to work in April, 1946, and worked steadily down to the date of the accident. He further testified with reference to his condition at the time of the trial that his pelvis, spine and back hurt him all the time, and he could not ''get around to do any good.'' He used crutches for about six months, and at the time of the trial he was using a cane which he had tried four or five times to discard, but was unable to do so because ''it hurts me so I can't walk without it.'' He was wearing a Taylor brace strapped about his body with steel supports. He testified that in order to get relief from his constant pain, he lies down about half of the time, and also massages his back about twice a day; if he walks too much the pain increases, and aside from walking, when standing still or sitting, he has pain. He has not done any work of any kind since the accident, nor earned any money or wages.

Three doctors testified concerning plaintiff's injuries—Drs. Levey and Pernoud, who were plaintiff's witnesses, and Dr. Lembeck (defendant's witness), who had charge of plaintiff's case at the Missouri Pacific Hospital. Of these, only Dr. Pernoud thought plaintiff to be permanently disabled. Dr. Levey did not examine or treat plaintiff, and he was unable to express an opinion on the question.

Dr. Levey, an X-ray expert, found from his X-rays that plaintiff has a deformity due to fracture of the right ischium (pelvis) with a little of the fracture extending through the bone at the lower border of the hip joint; also at the lower part of the right side of the pelvis was another area of deformity due to fracture extending through the pubic bone; "the right anterior part of the pelvis is depressed, pushed downward, as compared with the opposite side. There is a squeezing in, or deformity of the entire right half of the pelvis, affecting particularly the front part of this pelvis. The pubic bone . . . is depressed and pulled away from the opposite bone, with which it is normally in alignment. This section should be in line with the left pubic bone and should fall directly downward at the same angle and same level as the left pubic bone. We have the right pubic bone on this side depressed downward." Across the middle of the left pubic bone, he found an irregular density that might have been the result of a previous incomplete fracture that had healed prior to the taking of the picture; that the crack had healed with density and with no change of contour of the bone. He further testified that the opening shown between the right side of the pelvis and the left, the symphysis pubis, is a cartilaginous joint, a space containing cartilage and ligaments that bind the two front parts of the pelvis together. And, referring to the pelvis, he said that that part of plaintiff's body was very definitely deformed or distorted; that the deformity was due to fragments there, displacement of part of the bone structure of the pelvis due to fractures.

Dr. Levey, testifying from an anterior-posterior X-ray view of the lumbar region of plaintiff's spine from the pelvis up to the chest, found that it showed a compression of the second lumbar vertebra on the left side thereof, and a compression of the fourth lumbar vertebra on the right side, resulting in an S shaped curve of the spine, called scoliosis; that in that connection compression is synonymous with the word fracture; that a compression fracture is where the bone has been jammed down and pressed into itself.

Dr. Levey also referred to an X-ray of plaintiff taken by him two weeks before the trial, which he said showed that the depression of the right pubic bone was still present, as well as the deformity of the right side of the pelvis; that the "distortion and deformity and depression and displacement on the right side of the pelvis" were still shown; that there was "no appreciable difference in this and the one taken ten months before," which would indicate a "fixed displacement and deformity."

Dr. Pernoud first examined plaintiff on May 19, 1947, at which time plaintiff was walking with two crutches. He testified that plaintiff walked with a definite limp, with his pelvis and lower spine more or less fixed; that his pelvis was tilted down on his right side, and he had a curvature of the spine in the lumbar region, an S shaped

curve of his spine; that the top of the sacral bone—"the keystone bone"—opposite the point where Dr. Levey showed the symphysis pubis, is tilted to the left; that plaintiff had sustained compression fractures of the second and fourth lumbar vertebrae, and the witness prescribed a strong lumbar belt. He further testified: "Both ramus, limbs or branches of the right pubic bone were broken, with deformity and malposition. And symphysis pubis, where the pubis joins in the front, it's separated in the front and the right side is pushed down. The right superior ramus is broken and extends into the socket which forms the hip joint."

Dr. Pernoud further testified that the displacement, distortion and deformity of the right side of the pelvis is "a fixed condition that will remain in that condition from here on out, it will stay in a permanent condition." In answer to the question as to plaintiff's ability to work under conditions present at the time of the trial, the witness said: "I would say he is wholly incapacitated from doing any kind of manual work that would entail working and walking and being on his feet, not only at the present time but in the future." He further testified that the pain which plaintiff said he suffered would continue in the future.

Dr. Lembeck, who had charge of the treatment of plaintiff at Missouri Pacific Hospital, found when plaintiff was admitted to the hospital that he had a "fracture of the pelvis, superior ramus, on the right, a fracture of the inferior ramus, just below that on the right; and a separation of the symphysis pubic." The separation at the symphysis pubic was a downward displacement of ⅜ inch on the right. An X-ray taken April 1, 1947, showed these fractures and a fracture of the pubic bone in midline on the left. No other fractures were indicated. From an X-ray taken by Dr. Levey, Dr. Lembeck found that the fractures on the right side of the pelvis were "healing in good position"; and from another of Dr. Levey's X-rays it appeared that "the weight is borne in the hip joint in the left and in the hip joint in the right. That's normal alignment. The hip socket is not disturbed in the right or left." This X-ray showed that the fractures to the right side of the pelvis had healed in good position and that the displacement of the symphysis pubis still existed in the same amount. The effects would be:

"Q How long does that healing take?

A Ordinarily a fracture of the pelvis disables a patient six months to a year.

Q After a year's time do you see anything in the pictures you have seen here, or any of your observations of the plaintiff while he was your patient, to indicate any incapacity or inabilities, as result of injury, ▮▮▮ that would exist at this time?

A No, I don't. The fracture of the superior ramus has healed. The fracture of the inferior ramus has healed, and that

separation would be held by the normal capsule and fascia in that region.

Q Would that separation be enough to incapacitate a man from working at this time?

A That separation? I don't think it would. . . . I last examined him at the time he was discharged from the Hospital, April 18, 1947. I haven't seen him since. At that time it was my opinion he would be able to resume his regular work and perform hard, manual labor.''

The hospital record shows this notation when plaintiff returned as an outpatient: "May 20, 1947, fracture of pelvis with separation of symphysis pubis. Continued with crutches. Return in one month. Doing well. No pain in pelvis. Weight bearing, motions of hip are good. Dr. C. C. Drace.''

The question with which we are here dealing is one so frequently before the court that it would serve no useful purpose to restate the considerations affecting it, such as the size of awards permitted to stand in comparable cases, economic conditions, the fact there is no mathematical formula or accurate scale for determining whether and how much a verdict is excessive, etc. See Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S. W. 2d 157; Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S. W. 2d 568, where the cases are reviewed, and the injuries and amounts awarded are set out at some length. Joice's $65,000 award was reduced on appeal to $50,000. His injuries were more extensive than in the case at bar, and his case was decided in 1945. The largest award this court has permitted to stand is $80,000. Counts v. Thompson, 359 Mo. 484, 222 S. W. 2d 487. There the verdict was for $165,000, which the trial court reduced to $140,000, and this court on appeal to $80,000, for loss of both legs and injuries to arms, shoulders and back so as to prevent use of artificial limbs. In a somewhat similar case arising before the postwar inflation period, a verdict of $85,000 was reduced to $40,000 where both of plaintiff's legs had been amputated in such manner that he could not use artificial legs. (Aly v. Terminal R. Assn., 342 Mo. 1116, 119 S. W. 2d 363.) In Smiley v. St. Louis-San Franciso Ry. Co., (decided July 11, 1949, 359 Mo. 474, 222 S. W. 2d 481), verdict for switchman for $50,000, reduced on appeal to $27,500—loss of leg and nervous condition.

Plaintiff's injuries are much less severe than those in the Counts case, and probably more disabling than those in the Smiley case. In any event, we are of the opinion that the award is excessive, and that the judgment should not be permitted to stand for more than $42,500. Therefore, if plaintiff will, within 10 days from the date of filing this opinion, enter here a remittitur of $7,500, the judgment will be affirmed for $42,500; otherwise, it will be reversed and the cause remanded. All concur.