Allen V. ADAMS, Respondent,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a Corporation, Appellant.

No. 44290.

Supreme Court of Missouri.

Division No. 1.

May 9, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied June 13, 1955.

John H. Lathrop, Sam D. Parker, James F. Walsh, Jack W. R. Headley, Kansas City, for appellant.

Popham, Thompson, Popham, Mandell, Trusty & Green, and S. L. Trusty, Kansas City, for respondent.

DALTON, Presiding Judge.

Action for damages under the F.E.L.A. 45 U.S.C.A., § 51 et seq., for personal injuries sustained by plaintiff, a locomotive engineer employed by defendant in freight service, when the engine and train operated by plaintiff ran a red home signal and collided with the side of a Wabash freight train at a crossover near Hardin, Missouri, about 6:40 a. m., on July 18, 1950. The jury returned a verdict for plaintiff for $36,000, but the trial court ordered a remittitur of $8,000. When the remittitur was made, judgment was entered for plaintiff for $28,000. Defendant has appealed and contends (1) that plaintiff failed to make a submissible case for the jury; (2) that plaintiff's instructions 4 and 5 are erroneous; and (3) that the judgment is excessive.

The negligence of defendant and the negligence for which defendant was responsible, as pleaded and submitted by plaintiff, was the alleged negligence of defendant's train dispatcher at Marceline, Missouri, in ordering the crossover by the Wabash train at the particular time and place and under the circumstances then and there existing; and (2) the alleged negligence of the engineer of the Wabash train in failing to use the gyrating headlight on the Wabash engine in addition to the regular standard headlight and in failing to blow warning whistles while making the crossing over the track upon which plaintiff's train was approaching.

A rather detailed statement of the evidence favorable to plaintiff is required, since defendant-appellant contends (1) that it was guilty of no negligence as it was under no duty to anticipate that plaintiff would not timely see and obey the red home signal or that he would mistake the headlight on the Wabash train for a yellow home signal and act thereon until too late to obey the red home signal when seen; and (2) that plaintiff's own negligence was, as a matter of law, the sole proximate cause of his injury. We shall disregard defendant's evidence unless it aids the plaintiff's case.

Defendant maintained two main line railroad tracks extending east and west through the village of Hardin in Ray County. The north track being referred to as the westbound main line and the south track being referred to as the eastbound main line. Defendant also maintained a crossover track from its westbound main line to its eastbound main line and thence connecting with the Wabash Railroad Company's line to Kansas City, referred to as Wabash Track No. 3, or as track 3. It is conceded that the eastbound and westbound tracks, the crossover track, the interlocking plant, and the signal system are owned, operated, and maintained by defendant; and that the movements of all trains over the tracks and crossover are supervised and directed by defendant's train dispatchers. Signals have three color indications: Red or stop; yellow, which means proceed with caution and be prepared to stop at the next signal;

and green, which indicates a clear track ahead. The signals are operated by track circuits. There is, however, no claim that the signal system or the interlocking plant was inefficient or defective or that the brakes or braking system of defendant's train were inefficient or defective. Defendant's eastbound *distant* signal regulating traffic on its eastbound main line was located about 8,520 feet west of Hardin or 1.56 miles west of defendant's eastbound *home* signal. Its eastbound home signal was located 1,108 feet west of the Hardin station. Defendant also maintained a 9,515-foot side track which started 287 feet east of its Hardin station.

Plaintiff left Argentine, Kansas, for Marceline, Missouri, on the morning of July 18, 1950, between 3 and 4 a. m. The train, hereinafter referred to as plaintiff's train, consisted of three Diesel units and 95 or 96 freight cars. Plaintiff had been an engineer for defendant for some 30 years and was entirely familiar with defendant's track and signals and had made this run a great number of times. It was foggy when he left Argentine and as the train moved east the fog got heavier. It was nothing unusual to encounter fog in the river bottoms, but this was an unusually heavy fog. It was so dense and heavy that plaintiff could not see and recognize the signals over 150 feet. At Eaton, some 40 miles west of Hardin, plaintiff received a message to clear No. 18 Super Chief, ten minutes late, which meant that he was to clear, or take a siding, for Super Chief (defendant's fast passenger train) at some point further east so as not to delay it.

Plaintiff was familiar with defendant's rule 818 providing that during heavy fog or other conditions when vision and signal aspects are not readily discernible, "it shall be the duty of the engineer, or engine foreman to regulate the speed of their trains sufficiently to insure safety and under these conditions whistles must be frequently sounded and extra precautions for protection must be taken." Plaintiff so handled his train all the way from Argentine at a speed that he could see what the signals were.

As plaintiff approached Hardin the fog got heavier and very dense. He approached and passed defendant's eastbound distant signal more than one and one-half miles west of Hardin at 35 to 40 miles per hour and saw that the signal was yellow. Yellow is a caution signal and meant for him to proceed not in excess of one-half the regular speed and at not to exceed 30 miles per hour. It also indicated to him that the home signal would be red or yellow and that he should be prepared to stop at the next signal. Under the circumstances, if he should find the home signal red he would have to stop, but if yellow it would indicate that his train was to be put on the siding, beginning 287 feet beyond the Hardin station, to let the Super Chief pass. He knew Super Chief was close behind him, but it was nothing unusual to follow trains or to have trains following. Plaintiff was familiar with defendant's rule 273 providing that when he saw a yellow home signal he should be prepared to proceed to enter the turn-out or stop for the train or obstruction. If the home signal was yellow, then under rule 273 plaintiff said that he should have been operating his train at such speed that he could stop on the appearance of an obstruction or stop short of a train. On seeing the yellow distant signal, plaintiff made an application of the air brakes and slowed his train down to 15 to 20 miles per hour and "advanced expecting to find the home signal either red or yellow." He kept the brakes applied on the rear of the train and released on the head-end for a distance of about a mile and a half, as he approached and looked for the eastbound home signal. He had previously been stopped by the eastbound home signal at Hardin for various purposes, including while a Wabash train was crossing over to track 3, and there was nothing unusual about such a movement.

As plaintiff's train moved east on the eastbound main line and approached the eastbound home signal, which, as stated,

was 1,108 feet west of the Hardin station, the Wabash freight train containing ·110 cars approached the station from the east on defendant's westbound main line. It had stopped for a red westbound home signal 305 feet east of defendant's station and, when directed by signals, it had proceeded west to defendant's station where an order for the crossover was delivered to the Wabash train crew. The train then moved 193 feet further west to the east end of the crossover in question, thence 281 feet along the crossover track between the east-west main lines to defendant's eastbound main line, thence 91 feet west along the eastbound main line to the switch for Wabash track No. 3; thence 192 feet further west and south on track No. 3, as it curves to the left, to the fouling point between westbound cars on track 3 and eastbound trains on defendant's eastbound main line. The Wabash's three Diesel units and some five of its freight cars had passed this fouling point when · the collision in question took place. The fouling point mentioned was located 351 feet east of defendant's eastbound home signal.

As has been noted the collision occurred in the daytime at 6:40 a. m., on July 18, some one and one-half hours after sunup, in a dense and heavy fog. Plaintiff-respondent's position is that the nighttime signals should have been in use. In this connection, Wabash rule 16 provided that on engines equipped with gyrating headlights, the white beam will be displayed at night in addition to the standard headlight and that gyrating lights must not be dimmed when being used as such. There was evidence that the gyrating headlight was more powerful than the regular headlight. Wabash rule 9 provided that day signals must be displayed from sunrise to sunset, but when day signals cannot be plainly seen, night signals must be used in addition. Wabash rule 31(a) provided that when view is restricted by weather or other unusual conditions, enginemen should frequently sound the whistle to warn trackmen and others. The Wabash train crews were required to obey both the rules of defendant and the rules of the Wabash.

Defendant's rule 9 provided that day signals must be displayed from sunrise to sunset, but that when day signals cannot be seen, night signals must be used in addition and defendant's rule 17 provided that the headlight will be displayed to the front of every train by night; and that on engines equipped with gyrating lights the white beam will be displayed in addition to the headlight.

Defendant's rule 895 provided that enginemen will, in rounding curves where the view is obscured, and also at frequent intervals during storms and fogs sound the whistle using the signals prescribed in rules 14(1) and 14(q). Plaintiff's evidence further showed that the fog which existed on the morning of July 18 would affect the movement of trains as much as a rainstorm or something of that kind; that the engineer would slow down enough, as he would in a rain or any other kind of storm and as required by rule 818, but that train movements would still be directed by signals or colored lights; and that "the trains and the schedule and the system just goes on and operates exactly the same in dense fog as it does in clear weather with the sun shining."

The Wabash engine was equipped with a gyrating headlight in good working condition in addition to its regular standard headlight. The regular headlight was burning, but the gyrating one was not turned on. Further, the Wabash engineer did not sound the whistle from the time he approached a street crossing 150 feet to 1,200 feet east of the Hardin station. While making the crossover the Wabash engineer saw the headlight of plaintiff's train and knew it was on the same track, but he assumed that plaintiff would stop for the eastbound home signal as the Wabash was occupying the track east of it. He thought the train was about 300 feet away, but he could not tell whether it was moving or still. He made no attempt to warn plaintiff's train by turning on the gyrating head-

light or sounding the whistle. The headlight of plaintiff's train was dim and "had a yellow cast, which any light does through a fog." When he saw plaintiff's train pass the eastbound home signal he did nothing because plaintiff was then where he could see the Wabash train.

Plaintiff's evidence further tended to show that "the crews of an engine" are not given any information, verbally or in writing, to expect a crossover at a certain place, or that a certain movement will take place across their tracks; that the "railroad" relies entirely upon the signal lights for such matters; and that the railroad sets up a signal system and relies solely upon the signal system and the proper observance of the signals; that "regardless of whether or not there is a heavy fog or a congestion of traffic at some particular point, or movements scheduled to take place which will block certain tracks, the only warning of any situation like that which the engineman has and which the railroad provides is by the signal system and the signal lights"; and that this is true regardless of weather conditions. Accordingly, plaintiff was not told in advance that the Wabash was to make the crossover ahead of him at Hardin. Defendant's evidence also showed that trains are dispatched or controlled by this signal system in all types of weather.

Plaintiff also showed that the purpose of a gyrating or oscillating headlight was to warn automobiles and things at crossings of the approaching trains. The witness said he presumed it could be used "to warn automobiles and approaching trains"; that such a headlight would show that an engine was coming; and that the rules provided for sounding the whistle at frequent intervals and using signals during storms and fogs "where the view is obstructed." Plaintiff said the purpose of the gyrating headlight was "to warn the public or anyone that sees it down the line that this is an engine coming."

As plaintiff "came into the area approaching Hardin", he was "able to see and distinguish the lights of the railroad signals alongside of the tracks * * * at the distance of about 150 feet or 50 yards, not much further if any." He saw the yellow distant signal, as stated, and slackened speed. As plaintiff approached the home signal he was operating the engine and Eitel, the head brakeman, was in the fireman's seat. The track was straight. Plaintiff and Eitel heard no bell or whistle and saw no gyrating headlight, but saw a yellow light ahead of them in direct line to the home signal and both plaintiff and Eitel took this light to be a yellow head-in home signal, and they so called it. Plaintiff could not say who first called it "yellow." At that time the brakes were on, the speed of the train was 15 miles per hour and plaintiff could have stopped in 100 feet by shutting off the throttle and making a further application of the brakes. When plaintiff saw the yellow light and thought it was a yellow home signal, he thought he was to head his train in on the siding beyond the Hardin station and he "released the brakes and to let the train roll on down." Releasing the brakes reduced the pressure in the train line and for the next minute or so he had no ability to brake the train or control its speed. The brakes were released when plaintiff was 100 feet west from the eastbound home signal which was red. Plaintiff testified that it "turned out to be about 100 foot to their home signal, Mr. Eitel called a red board, it was at the same time I called a red board and I seen the red cars of this Wabash train." He saw the red coal cars of the Wabash going over the crossover 400 to 450 feet away. He was able to see them on account of the strong headlight of his engine shining on the red cars. With the brake pressure down to 60 pounds, when normal pressure is 80 pounds, plaintiff made an emergency or full application of the brakes and "of the independent air" and the train moved on to a collision with the Wabash train at the fouling point on the crossover and plaintiff was injured. The collision occurred while plaintiff's train was moving 3 or 4 miles per hour. The front Diesel moved some 50 feet further and was thrown to the north side of the track and

over at a 45 degree angle and the right-hand side of the cab was torn off.

Before plaintiff released his brakes he knew that he was approaching the east-bound home signal and he was looking for it. The signal is referred to as a sema-phore signal. It was located 634 feet west of the west switch of the crossover. Plain-tiff said the signal was located 16 to 18 feet above the track and 6 or 7 feet south of the south rail of the eastbound track. He fixed the height of a standard head-light at 10 to 12 feet above the rails.

The "yellow light" which plaintiff had seen was the headlight on the westbound Wabash train, which was then on the east-bound track making the crossover and di-rectly in front of plaintiff's train. At the time, on account of the fog, the light ap-peared about the distance of the home signal. Plaintiff had no way to tell how far it was away but, later, plaintiff found it to have been about 600 to 1,000 feet east of the home signal when he had first seen it. Plaintiff said that at a greater distance back, west from this home signal, he had seen this headlight shining through the fog; that because of the fog he was misled into thinking it was a yellow home signal; that he figured he was going into the siding east of Hardin for the Super Chief and, therefore, he was not intending to stop at the home signal. If he had been in-tending to stop at the home signal he would have been going at 5 miles per hour when he got to it. Plaintiff admitted he had mistaken the 250 watt bulb headlight of the Wabash engine, with a bright re-flector behind it, for the 11 watt bulb of the type used in the home signal light. Plaintiff further said that he never did see whether the eastbound home signal was red or not, but he called a "red board" 100 feet before he got to it.

Plaintiff testified that the headlight on his own train did not conflict with the red light on the eastbound home signal, but that the headlight on the westbound Wa-bash train conflicted with the headlight on his train and conflicted with plaintiff seeing the red light in the home signal to the extent that the Wabash headlight looked like a yellow home signal. He said that if he had seen a gyrating headlight on the Wabash engine or had heard the Wabash whistling "it would have indicated to me that this (light) could not have been a signal, but (was) an engine." There was also evidence to the effect that when you see a gyrating headlight you know there is an engine coming.

The purpose of ordering the crossover in question was to clear the main line for other trains and to put the Wabash train on its own track 3. Wabash trains do go down the westbound main line, if they have cars to set out at Henrietta. The reason the Wabash train was not sent westbound to C. A. Junction or Henrietta could have been because the dispatcher had other trains and he put the Wabash on their own tracks so he could use the Santa Fe track. Un-less cars were to be set out or passengers were to be discharged at Henrietta, Wa-bash trains were sent down their own track 3.

Other evidence which plaintiff-respondent insists shows a negligent order for the crossover is as follows: Defendant's dis-patcher at Marceline had complete control of the movement of all trains at Hardin. The movement of trains was within his absolute discretion. He could have held the Wabash train, which arrived first, un-til after plaintiff's train and the Super Chief had passed and he could then have ordered the crossover to the Wabash track 3, or he could have held both plaintiff's train and the Wabash train, or he could have routed the Wabash west on the de-fendant's westbound main line. Plaintiff's train could have passed through Hardin, except for the collision, and gotten onto the siding in 3 to 5 minutes. Holding the Wabash train for plaintiff's train to pass would have delayed the Wabash five to ten minutes. The dispatcher knew of the existence of the dense fog up and down the defendant's line and weather conditions were sometimes taken into consideration in dispatching trains. The dispatcher also knew that plaintiff's train and the Wabash train would arrive at Hardin about the

same time. He knew that, if the Wabash were permitted to cross over the 110 car Wabash train might not be in the clear before the plaintiff's train arrived. He knew the trains would for a time be facing each other on the same track. He said that, in handling the trains, he did not give any consideration to the existing conditions of dense fog, but left all safety measures up to the enginemen and trainmen of the trains. Defendant's witness testified:

"A. The records show it was a dense fog. * * *

"Q. Do you as a dispatcher in charge of the district ever take the weather conditions into consideration in dispatching the trains? A. No, sir, that is up to the engineer and men on the train.

"Q. Mr. Walker, you don't make allowance for weather yourself when you dispatch the trains? A. No, sir."

The dispatcher had intended for plaintiff's train to head-in on the siding east of Hardin, after the Wabash train had cleared, and then to wait for the Super Chief to pass.

 In considering this case we are governed by the decisions of the Supreme Court of the United States construing the Federal Act, supra. Under these decisions the defendant (employer) is not an insurer of the plaintiff's (employee's) safety and proof of injury without proof of negligence will not authorize a recovery of damages. It is incumbent upon the plaintiff to plead and prove both that defendant was negligent and that such negligence was a proximate cause of the injury sustained. Plaintiff is required to present probative facts from which negligence and causal relation may reasonably be inferred. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 411, 88 L.Ed. 520. It is only when there is a complete absence of probative facts to support a conclusion of negligence and proximate cause that a case under the Act may be taken from the jury. If there is an evidentiary basis for a jury's

verdict for plaintiff, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion and it is immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 744, 90 L.Ed. 916. And see Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S.W.2d 418, 422.

Appellant argues that plaintiff made no case for the jury because no reasonably prudent person would have anticipated that the plaintiff would mistake the headlight on the Wabash train for a yellow home signal. Appellant says there is no evidence in the record to justify a holding that the defendant had any notice, actual or constructive, that an experienced engineer like plaintiff, or any trainman would, in the dense fog, mistake the 250 watt headlight on the Wabash engine for an 11 watt yellow home signal, especially when the Wabash headlight was 600 to 1,000 feet beyond the home signal and the home signal was red and was between the two trains. Appellant's theory is that there was no evidence of negligence and no proof of proximate cause, if negligence was shown, and that plaintiff's negligence was the sole proximate cause of the collision and injury.

 In this case two assignments of alleged negligence were submitted in the conjunctive and it is only necessary for us to determine that a submissible case was made for the jury on one of the two assignments submitted. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91. The evidence, as heretofore set out, was sufficient to show a violation of certain safety rules which were applicable under the factual conditions shown to exist. The evidence concerning the existing fog and its effect upon the ability of employees to see and distinguish signals was sufficient to make an issue of fact as to the reasonable necessity for the use of these nighttime signals in the daytime, including the use of the gyrating headlight on the Wabash engine and the frequent sounding of the

whistle while making the crossover. Violation of these safety rules was evidence of negligence.

◼ From the violation of these safety rules some injury to employees or to members of the public could reasonably have been foreseen. Under such circumstances it was unnecessary to show that the particular collision and injury to plaintiff could have reasonably been anticipated. In such situation the question is whether, after the injury is complete, it appears to have been a natural and probable consequence although not a necessary and inevitable consequence of the defendant's negligence. Gaines v. Property Servicing Co., Mo.Sup., 276 S.W.2d 169, 174, and cases there cited; Miller v. Brunson Const. Co., Mo.Sup., 250 S.W.2d 958.

◼ It is true that plaintiff's evidence tends to show that the safety signals in question, such as gyrating headlights and whistles, are intended to warn automobiles and persons on crossings or about the tracks *of the approach of trains* and there is little or no evidence in this record of the use of such signals on one train (such as the Wabash) to govern, regulate or control the operation of another train (such as plaintiff's) and it is true the Wabash train did not run into plaintiff's train, but plaintiff's train ran into the side of the Wabash train. Nevertheless, it is clear that the rules in question were intended for the protection of employees and others, including the plaintiff, and plaintiff's evidence tends to show that, if they had been complied with, plaintiff would have known of the presence of the Wabash engine and train and would not have been injured.

Plaintiff's evidence further tended to show that, as he approached the home signal in the dense and heavy fog, he was operating at such a speed and his brakes were in such condition that he could stop in 100 feet; that he saw the headlight of the facing Wabash train directly ahead of him on the same track; that the headlight looked yellow in the fog and appeared to be in the position of the home signal;

that he thought it was a yellow home signal; that he released his brakes to coast into the siding beyond the station; and that he then saw and called a "red board" and saw the red cars of the Wabash train, but too late to avoid the collision and injury. His evidence is further to the effect that if the Wabash train had complied with the safety rules by using the gyrating headlight and frequently sounding the whistle, as required, plaintiff would have known of the presence of the Wabash train and would not have mistaken its headlight for a yellow home signal. The evidence offered was such that the jury could infer and find that the collision and injury was a natural and probable result of the Wabash engineer's failure to obey the safety rules and that defendant was negligent, as charged, and the plaintiff's injuries directly and proximately resulted from defendant's negligence. In such situation it is unnecessary to determine whether there was evidence that the dispatcher was negligent in ordering the crossover.

◼ Appellant's contention that plaintiff's negligence was the sole proximate cause of his injury is based upon the evidence as to plaintiff's experience as an engineer, his familiarity with the operation in question, his knowledge of defendant's rules and of the locations and type of its signals, his knowledge of the foggy condition and of its effect on visibility and of other facts shown by the record. Appellant insists that under all the facts and circumstances shown the plaintiff was negligent in mistaking the headlight on a moving westbound train for a yellow eastbound home signal, which was red, and that such negligence was the sole cause of his injury. Our holding that the evidence was sufficient to make a submissible case of negligence and causal connection against defendant disposes of this contention. The issue of proximate cause was for the jury. The court did not err in refusing to direct a verdict for defendant.

◼ Appellant next contends that instruction 4 is erroneous because unnecessarily long, complicated, argumentative,

misleading and confusing. It covers some seven pages of the record, contains 13 numbered and 2 unnumbered paragraphs. The several paragraphs are connected by the word "and", but appellant insists that the instruction "is so drafted that it does not tell the jury 'that if you further find and believe the matters in each paragraph', but omits a 'further finding', which is confusing and misleading." Appellant says that the instruction contains 1,324 words; that it does not present a fair, factual presentation of the facts essential for recovery; and that the verbosity of the instruction was enough to mislead the average jury.

There is some repetition within the instruction and also of some matters covered by other instructions, but the instruction fully covers the plaintiff's case as shown by his evidence. The trial court did not consider the repetitions to be prejudicial. See Wells v. City of Jefferson, 345 Mo. 239, 132 S.W.2d 1006, 1009. The instruction requires a finding in the conjunctive of all of the necessary facts and it submits the two issues of negligence in the conjunctive as hereinbefore mentioned. It submits and requires a finding of negligence and causal relation before a verdict for plaintiff. The several paragraphs are not unusually long and they have been distinctly separated and numbered. While the instruction is not a model we do not consider it to be prejudicially erroneous in the respects hereinbefore contended for by appellant.

■ Appellant further contends that the instruction is erroneous because some of the findings submitted are unsupported by evidence, including the submission (1) that the train dispatcher was negligent in permitting the Wabash train to proceed over the crossover; (2) that in the exercise of ordinary care the dispatcher could or should have known the regular headlight would probably appear as a yellow light in the fog; (3) that the movement of the Wabash over to track 3 was reasonably likely to create danger of a collision between the two trains; and (4) that the dispatcher in giving the order for the cross-

over failed to exercise ordinary care. Essentially, this complaint is that the instruction submits an assignment of negligence which is not supported by the evidence, however, since the submission is in the conjunctive with an assignment that is supported by evidence the instruction is not reversibly erroneous, even if the assignment in question is not supported by evidence. Bowman v. Standard Oil Co., 350 Mo. 958, 169 S.W.2d 384, 386; Wright v. Spieldoch, 354 Mo. 1076, 193 S.W.2d 42, 47(10); Oesterle v. Kroger Groc. & Baking Co., 346 Mo. 321, 141 S.W.2d 780, 781; Rinderknecht v. Thompson, 359 Mo. 21, 220 S.W.2d 69, 74(11); Lanasa v. Downey, Mo.App., 201 S.W.2d 179, 182. The trial court did not find the instruction prejudicial or misleading by reason of the inclusion and submission in the conjunctive of an assignment of negligence unsupported by evidence. If it had done so we would have had a very different question.

■ Appellant next contends that instruction No. 5 is erroneous because there is no evidence to support a finding of impairment of past or future earning power. We think the record fully supports the submission to the effect that the jury could take into consideration any impairment of the "power to work and labor and earn money in lines of work other than railroad work or for railroad companies", in the past ("to date") directly resulting from plaintiff's injuries or that "he is reasonably certain to sustain in the future, if any", as a direct result of his injuries. The evidence of impaired power to work will subsequently be reviewed. There is evidence that plaintiff on July 18, 1950, received permanent injuries which have adversely affected his ability to do work and labor and earn money and which will continue to do so. See Wolfe v. Kansas City, 334 Mo. 796, 68 S.W.2d 821, 822; Perrigo v. City of St. Louis, 185 Mo. 274, 289, 84 S.W. 30; McGarvey v. City of St. Louis, 358 Mo. 940, 218 S.W.2d 542, 546.

■ Appellant further contends that instruction No. 5 is erroneous because it permits the jury to allow damages for future

pain and suffering without requiring the jury to find such damages would be reasonably certain to be suffered in the future. The instruction is in part as follows: "In determining the amount of such damages you can take into consideration such physical pain and mental suffering as you find from the evidence he has endured to date by reason of such injuries and such as you find from the evidence he will endure in the future, if any, as a direct result of such injuries." We think the instruction clearly restricted consideration of future pain and suffering to such as the jury might find from the evidence that plaintiff "will endure in the future, if any." The words "will endure" are quite as strong as, if not stronger, than the words, "reasonably certain to endure", which appellant suggests. The assignment is overruled.

Appellant's final assignment is that the judgment is excessive. We will review the evidence favorable to the verdict and judgment. Plaintiff was 59 years of age and had an expectancy of 14.74 years, when he was injured. He had been employed by defendant for 35 years, 30 years as a locomotive engineer, and was in good health, active, vigorous and able to carry on his work and enjoy himself. He had served a three year apprenticeship in cabinet work before going into railroad work and for several years he had worked as a carpenter and cabinet maker. He had kept active in cabinet making and wood working, as a hobby, over the years. He had done all of the repair work about his own home and had $2,500 worth of tools in his shop. Under present conditions a good cabinet maker and carpenter could make $600 per month in the area about Marceline, plaintiff's home town, but plaintiff had not been able to do any cabinet work or carpentering, except for a few minutes at any time since he was injured.

Plaintiff admitted that he was discharged by defendant for cause arising out of this collision and that, as a result of his discharge, he could not hereafter work for defendant or any other railroad. After evidence of plaintiff's average monthly earnings, prior to his discharge, had twice been presented before the jury, it was withdrawn by consent and the jury was directed to disregard it.

When the collision occurred, plaintiff was standing behind the controls and brake valves on the right-hand side of the engine. The side of the cab was torn off in the collision. Plaintiff was thrown across the cab and knocked unconscious. When he came to he was lying across the fireman's seat on the left side of the cab and the engine was still operating. Under the stress of the occasion, plaintiff was able to climb down and attempt to stop the engine by shutting off the fuel line, but when the excitement was over he found that he had been injured in the back, ribs, neck, right knee and over the pelvis bone. He received treatment at Richmond, and was then taken to Hardin and on to Marceline, where he was treated in the hospital and he, later, spent two weeks on two different occasions in a hospital at Topeka, Kansas.

Concerning his present condition, plaintiff testified that he can't sit down or lie down for more than a short time without changing position; that his right knee is not stable but liable to give way at any time; that he suffers almost continuously from severe headaches and from pain in his back and he has to wear a support; that he has a very limited use of his neck; that it grinds at the base of his skull when he turns his head; that the movement of his head is very limited and he has to turn his body with his head; that there is a 40 to 50 per cent limitation of movement in his back; and that three ribs, which were broken have healed, but they bother him on the left side. He has had pain practically all the time since he left the hospital and he has had to see his physician fifteen to twenty times to get medicines for relief of pain. Plaintiff also suffers from extreme nervousness and insomnia. He had had diabetes of a mild type for five years and had been dieting for it. He has now lost some 65 pounds and walks cautiously with a cane. He uses an infra-red ray lamp to get relief from pain and he sleeps with a board under his mattress. Before the col-

lision plaintiff had experienced no restrictions in the movement of his head, neck or back. His ribs and chest were in perfect condition. He hardly ever had a headache. His knees were in good shape and very stable.

Plaintiff's medical evidence showed that he had tenderness and muscle spasm or contraction from where the skull joins the neck to where the neck joins the body. The same condition of tenderness and muscle spasm existed in the lower back and lumbar region and motion is limited to 30 per cent of normal. Muscle spasm is an involuntary action causing pain and indicating an injury. The movement of his head in all directions is limited to about fifty per cent of normal capacity. There is tenderness and a limitation of expansion of the chest, particularly on the left side. Movement of the lower back in bending forward, backward, and to the side is limited to about 40 per cent in all directions. The right knee shows tenderness over the internal lateral aspect and in the popliteal space on the external aspect with flexion slightly limited. When plaintiff bends or twists his head there is a grating sensation and the grating can be heard. There is a diminution or narrowing of the disk space at the fifth lumbar and the sacrum. Tests indicated damage to the fifth lumbar nerve and to the right lower back. Plaintiff wears a canvas type of apparatus around him to support the movement of his back and to support the muscular and supporting structures. There is a diminution in sensation on the back and lateral aspects of the right leg indicating damage to and pressure on the fifth lumbar nerve. While plaintiff had arthritis prior to his injury, it was not disabling, but since experiencing the violent and severe trauma in the collision it has been painful and disabling. There are now advanced arthritic changes in the cervical neck. The arthritis is of the degenerative type and of long standing. Plaintiff is totally and permanently disabled from industrial type of employment and from any gainful occupation that involves manual labor. In the opinion of his physician his disability was caused by the injuries sustained in the collision. His condition has deteriorated instead of improved. No amount of hospital or medical expense was shown.

Appellant cites and relies upon the case of Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 230 S.W.2d 856, 858. Appellant says that plaintiff's age, complaints, prior health and his subsequent disability are very similar to those in the Osburn case; that there is no evidence in the record as to the amount of any earnings by plaintiff prior to his injury; that there is no evidence of loss of future earnings; that, after the collision plaintiff was able to climb down and attempt to turn off the motors, and then walk to the Hardin station; that plaintiff's contributory negligence "should materially reduce his recovery"; and that the evidence in the record will not support an award in excess of $15,000. In the Osburn case the plaintiff was not totally disabled as in this case.

There is no precise method for determining the maximum award which the evidence in this case will support. Each case must be considered upon its own peculiar facts and where the trial court has considered and passed upon the matter and has ordered a substantial reduction, we are usually reluctant to order a further reduction. Willis v. Atchison, T. & S. F. R. Co., 352 Mo. 490, 178 S.W.2d 341, 343.

After a careful consideration of the record in this case and after applying the well established tests, we are of the opinion that the award should not be further reduced.

The judgment is affirmed.

All concur.