Emma K. HEPPNER, Administratrix of the Estate of John O. Heppner, Deceased, Respondent,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a Corporation, Appellant.

No. 45138.

Supreme Court of Missouri.

Division No. 1.

Dec. 10, 1956.

Opinion Modified on Court's Own Motion and Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 16, 1957.

Robert L. Robertson, Frederick J. Freel, Kansas City, for plaintiff-respondent.

John H. Lathrop, Sam D. Parker, James F. Walsh, Jack W. R. Headley, Kansas City, for defendant-appellant, The Atchison, T. & S. F. Ry. Co.

HOLMAN, Commissioner.

Action for wrongful death instituted by plaintiff, as administratrix of the estate of her deceased husband, John O. Heppner, under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. A jury trial resulted in a verdict for plaintiff in the sum of $27,500. Defendant has duly appealed from the ensuing judgment.

The amended petition alleges that on September 5, 1952, Heppner, while riding as a rear brakeman in the caboose of one of defendant's freight trains, was injured when the caboose was "caused to be suddenly, unexpectedly, violently, and unusually jerked." It was further alleged that as a result of said jerk decedent received an injury to his head and to the small of his back, which injuries either caused him to develop a cancer from which he died on January 20, 1953, or that said injury activated and aggravated a pre-existing inactive cancerous condition, thus causing his death.

At the outset, defendant contends that the trial court erred in overruling its motions for a directed verdict for the reason that plaintiff failed to make a submissible res ipsa loquitur case in that there was no substantial evidence of a violent and unexpected jerk or lurch of the caboose. In view of this contention we will state the evidence upon this issue in some detail.

The incident in question occurred on September 5, 1952, upon one of defendant's eastbound freight trains which left Newton, Kansas, at about 6:40 p. m. with Emporia, Kansas, as its destination. The only men riding in the caboose were Heppner and the conductor, Arthur Waldrop. After leaving Florence, Kansas, the train contained about 75 or 80 cars and was proceeding on a level stretch of track. About three miles east of Florence, while proceeding from 30 to 40 miles per hour, the

train entered a moderate curve to the left. At this time Conductor Waldrop was sitting at his desk near the west end of the caboose and Heppner was in the cupola which is at the east end thereof. The cupola is described as a small structure extending above the roof of the caboose, with windows therein, which is used by the crew in observing the train, tracks, etc. Just before the caboose reached the aforementioned curve it gave a lurch forward with sufficient force to raise the front legs of the conductor's chair from four to six inches from the floor, and at that same time the conductor heard falling glass in the cupola. Conductor Waldrop testified that three or four minutes later Heppner got down out of the cupola and was rubbing the back or top of his head. The conductor observed a little cut place on his head which was bleeding slightly, and also noticed a little blood on decedent's cap and a small hole therein. He asked decedent if he wanted to make out an accident report, but Heppner replied in the negative stating that it didn't amount to anything. A little later the conductor climbed up into the cupola and saw that the rear (west) glass therein was broken.

Conductor Waldrop testified that the lurch of the train was apparently caused by "slack" running out. He was examined at various times in regard to the violent and unusual nature of the lurch in question. As heretofore stated, he said the caboose "gave a lurch forward" which tipped his chair off the floor; that it was "an unusual jerk." In another instance the witness stated that if a train is being operated properly there should be no reason to expect a lurch while the train is traveling along level track; when asked to describe the severity of this particular lurch he stated that he could only approximate it; that it was a moderate jerk; that he had had jerks that were worse and had experienced some that were of less severity. He stated on cross-examination that there was nothing unusual about slack action in a long freight train and that occasionally it is experienced when the train goes around a curve; that he had experienced it there before.

Ralph S. Frush, a consulting engineer, made a survey of the 5-mile section of the track east of Florence and prepared a plat thereof which was admitted in evidence. He testified that this section of track was level and that the curve heretofore mentioned was a mild, gradual curve 4,491 feet in length. He estimated that the freight train in question was 3,525 feet long.

Plaintiff also presented T. J. Coulter who had had 18 years' experience as a brakeman and extra conductor for the Milwaukee Railroad, who testified as an expert. According to this witness, there is a certain amount of "slack" or "play" in the drawbars and couplers between each of the cars. Slack action is a sort of accordion action which occurs when this slack between the cars is either extended or reduced. This action often causes the various cars of the train to jerk or lurch. The extent of the severity or violence of these jerks will vary greatly. Mr. Coulter stated that some of the causes of slack action are starting or stopping the train, hogbacks (humps) in the track, sags in the track, severe curves, and failure of equipment. He stated that a curve must be severe in order to cause slack action. He examined the plat of the track in question and considered certain facts stated in a hypothetical question and testified that he could see no reason for a jerk because of the curve in this section of track; that he wouldn't have expected a jerk there.

Plaintiff, Emma Heppner, testified that she was the widow of decedent; that when he came home on the night of September 5, 1952, he appeared to be in pain and had a knot and cut place on his head which she bathed with campho-phenique and applied a dressing. She stated that he also had a welt across his back about one inch wide, and on the left side of his back was a "puffed up place." She related that he continued to work until September 15, at which time he was feeling so badly that at her

request he laid off for a week and they visited in Norton, Kansas, and in Kansas City. By this time decedent was having violent headaches at intervals. He went back to work on the 22nd and worked until the 29th. Plaintiff stated that she had noticed that decedent seemed to drag his right leg and that he appeared to be suffering, had lost interest in things, and had become irritable, whereas, prior to September 5 he had been a jolly, happy, healthy person. On October 1, they went to Mammoth Springs, Arkansas, to visit. Plaintiff stated that her husband drove the car but had difficulty keeping it on the road. After arriving in Arkansas his condition became worse and he went to a doctor. At the direction of the doctor plaintiff took her husband to the Santa Fe Hospital in Topeka, on October 7, where he remained until his death. Details concerning the examination and treatment of Mr. Heppner, as well as evidence concerning the cause of his death, will be hereinafter stated and discussed.

■■ In considering F.E.L.A. cases, we are governed by the decisions of the Supreme Court of the United States. The opinions of that court have declared that, to the maximum extent proper, questions arising under that Act shall be left to the jury. "It is only when there is a complete absence of probative facts to support a conclusion of negligence and proximate cause that a case under the Act may be taken from the jury. If there is an evidentiary basis for a jury's verdict for plaintiff, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion and it is immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." Adams v. Atchison, Topeka and Santa Fe Railway Co., Mo.Sup., 280 S.W.2d 84, 91. See also, Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S.W.2d 418; Raze v. St. Louis-Southwestern Ry. Co., 360 Mo. 222, 227 S.W.2d 687.

■ The evidence in the instant case supports the contention of defendant that a certain amount of lurching and jerking is a part of the regular and usual operation of freight trains. Therefore, in order for the res ipsa loquitur doctrine to be applicable to a jerk of the caboose, the jerk must be so unusual and violent that it indicates negligence or a failure to use ordinary care. Wampler v. Atchison, T. & S. F. Ry. Co., 269 Mo. 464, 190 S.W. 908; Conser v. Atchison, T. & S. F. Ry. Co., Mo.Sup., 266 S.W.2d 587. In this connection a circumstance to be considered is whether the employee should have had reason to expect the jerk at the time and place it occurred.

■ Considering all of the evidence upon this issue, in the light most favorable to plaintiff, we have decided that there was sufficient substantial evidence from which the jury could reasonably have found that the jerk or lurch in question was unexpected, violent, and unusual. While it is true that the conductor in one instance described the jerk as moderate, it must not be overlooked that he also testified that it was "unusual" and was of sufficient force to tip the front legs of his chair from four to six inches off the floor. He stated further that there was no reason to expect a lurch while the train was traveling along level track. Coulter, the expert witness, also expressed an opinion that the curve upon which the train was proceeding was not severe enough to cause a jerk and that he would not have expected a jerk there. Moreover, in connection with the other evidence, we think it proper to consider the physical fact that the lurch was of sufficient force to cause decedent's head to be thrown against the cupola glass and to break it. (While this occurrence was not established by the testimony of an actual eyewitness, the testimony of the conductor was certainly sufficient to authorize a finding that decedent's head struck and broke the glass as a result of the jerk.) For the reasons stated, we rule that the trial court did not err in overruling the motions for a directed verdict.

■ Defendant next complains of error in the giving of plaintiff's main instruction (No. 1) which contained the following: " * * * and that the aforesaid injuries to John O. Heppner's back and head in and of themselves caused a cancer in his body and his death by cancer, if you so find, and if you find that the aforesaid injuries to John O. Heppner's back and head activated, stirred up and aggravated and caused to spread a pre-existing, dormant, inactive, and nonpainful cancerous condition in John O. Heppner's body and his death by cancer * * *." It is said that there is no evidence to support this submission because there is no proof that the blow to the head or back caused cancer from which decedent died or activated a pre-existing dormant cancerous condition which caused his death. It is further argued that the conjunctive submission of the two means of causing death by cancer was inconsistent and contradictory and hence constituted reversible error. At first blush, it would appear that the criticized submission was inconsistent. This for the reason that it could not ordinarily be said that an injury could cause a condition that already exists. However, in the light of the particular circumstances and evidence in this case, we have concluded that there was no inconsistency. The difficulty in hypothesizing the submission relating to the cause of death would appear to arise from a question of description or terminology which is not made clear by the evidence in this case. We refer to the question of the proper manner of describing a cancerous condition which manifests itself in a part of the body where it did not previously exist, but which is said to have spread through the blood stream or lymphatic system from a primary cancer in another part of the body. Some of the doctors in this case seem to regard the primary and secondary condition as one cancer, and others referred to the separate diseased areas as if they constituted multiple cancers.

■ It would seem to have been plaintiff's theory that, at the time of the in-

juries in question, decedent had an inactive cancer in the adrenal gland which was activated by the blow to his back, and as a result thereof the cancer cells were caused to spread through his body and thereafter appeared in the weakened or abscessed area of the brain which existed as a result of the blow to his head. Since under the evidence in this case the jury could have found that as a result of these injuries cancer cells were caused to lodge in the brain, and that a cancerous growth appeared in that area where it had not previously existed, it could reasonably have considered that these injuries caused the cancer in the brain, whereas there was no real contention that the cancer in either area was originally caused (and had its inception independently from any existing or dormant cancer) by these injuries. Therefore, we conclude that the two theories embraced in the questioned submission were not inconsistent and that the jury would understand that it was to find for plaintiff if it determined from the evidence that these injuries activated a dormant cancer in the adrenal gland, which activation caused a cancer to thereafter become manifest in the brain, and that decedent died as a result of these conditions. In determining the correctness of instructions, "we should not be hypertechnical in requiring the use of particular words or phrases, or in requiring any particular arrangement or form of language. Rather, we should determine whether average laymen have been sufficiently apprised of the necessary facts to be found by them and of the correct legal conclusions which follow." Sauer v. Winkler, Mo.Sup., 263 S.W.2d 370, 374. As indicated, we do not think the jury could have been misled by the instant instruction and hence any imperfection in the technical manner of submission would not have been prejudicial.

■ The contention that there is no evidence to support the submission requires that we review the evidence relating to Mr. Heppner's illness, treatment, and the cause of death. On the day he entered the hospital, Dr. R. P. Woods, a neuro-surgeon

connected with the Menninger Foundation, was called in as a consultant and thereafter was primarily in charge of the examination and treatment of this patient. After certain preliminary tests, Dr. Woods thought Heppner was suffering from a stroke caused by a tumor, abscess, or blood clot. On October 10, 1952, he performed an operation in which two "burr holes" (each about the size of a nickel) were bored in the left frontal skull. The doctor had hoped (and perhaps expected) to find a subdural hematoma (a blood clot underneath the bony cavity of the brain). He was unable to find a hematoma, but upon inserting a needle about 2½ inches into the brain, found an abscess capsule from which he withdrew a considerable quantity of pus and then injected the area with penicillin. It appears that within the next four or five weeks fluid was withdrawn from the abscess on a number of occasions, and in each instance a specimen thereof was sent to the laboratory and no cancer cells were found therein. The patient did not make favorable progress and on November 13 a major operation was performed for the removal of the brain abscess. Dr. Woods at that time removed what he described as a soft mushy abscess capsule, but upon pathological examination, this was found to be a rare type of rapidly growing malignant tumor which was called a malignant melanoma. Thereafter, it may be said generally that Mr. Heppner's condition became progressively worse and he died on January 20, 1953. An autopsy disclosed a malignant melanoma in one of the adrenal glands (which is located near the kidney) and a similar condition in decedent's lungs, chest and brain. The tumor (tumor in this opinion, as in the testimony, is used always to describe a malignant growth) had recurred in the region where it had been removed by the operation and another one was found in the back part of the brain.

In addition to Dr. Woods, the defendant presented a number of physicians, specialists in pathology, who testified upon various phases of the issues concerning the illness and cause of death of Mr. Heppner. Plaintiff presented two expert witnesses (surgeons) who expressed opinions concerning the illness and cause of death of deceased. We think it may fairly be said that all of the medical testimony indicated that the cancerous condition originated in one of the adrenal glands and thereafter spread to the other areas indicated. It may also be stated that all of the physicians who testified for defendant were of the opinion that the injuries received by decedent did not cause or activate the malignant tumors from which he died. They seem to be of the view that there was no connection between the injuries and that condition.

One of the experts who testified on behalf of plaintiff was Dr. J. A. Nigro. At the request of plaintiff, he had examined the rather detailed hospital records concerning the illness, treatment, and cause of death of Mr. Heppner. A hypothetical question was propounded to Dr. Nigro wherein he was asked to consider all of the information he obtained from examination of those records, and in addition, the evidence was hypothesized rather fully concerning the injuries received on September 5 and the subsequent events concerning the extent and progress of Mr. Heppner's injuries and illness which did not appear in the records. This question concluded with the following: "In your opinion, doctor, did the injuries sustained by John O. Heppner on September 5, 1952, cause or contribute to cause his death on January 20, 1953, from a malignant melanoma? A. I would say with a reasonable certainty that it had a definite effect in the causing factor of his death." Dr. Nigro further stated that he was of the opinion that the blow on the decedent's head had been a contributing cause of the formation of a sub-dural hematoma which, in turn, had caused the brain abscess which was a contributing cause of decedent's death; that his death was caused by cancer and the abscess. He stated that trauma definitely is a causative

factor in activating a pre-existing cancerous condition and that this is particularly true of a malignant melanoma.

Defendant contends that the testimony of Dr. Nigro will not support the submission because he stated on cross-examination that the abscess and the cancer were two different things. Since the effect of the abscess was not a part of the submission, and since the doctor testified that the abscess contributed to his death, it is said that the testimony did not constitute substantial evidence that the injuries caused or contributed to cause death by cancer. A consideration of all of the testimony of this witness does not indicate to us that the doctor intended to state that the abscess and the cancer involved two separate areas in the brain. We think he intended to use "abscess" as indicating the portion of the capsule which contained pus, and "cancer" as indicating the portion thereof which contained the cancer cells. All of the evidence in the case indicated that the capsule that was removed on November 13 was the portion of the brain that has been previously referred to as an abscess and which was also found to contain cancer cells.

Dr. J. W. Graham, the other expert presented by plaintiff, had examined all of the hospital records and was asked a hypothetical question similar to the one propounded to Dr. Nigro which concluded with the following: "In your opinion, did the injury as outlined and sustained by John Heppner on September 5, 1952, cause or contribute to cause his death on January 20, 1953, from malignant melanoma as shown and disclosed and described in the hospital records?" He answered in the affirmative and further stated, "the death was caused by hemorrhaging of the brain, and the tumor that was found was contributory to his death." He was of the opinion that the brain hemorrhage, which he said was caused by the blow on decedent's head, broke down and subsequently constituted the abscess that was found in the brain; that because of this abscess decedent could not eat or drink properly and

his body became depleted so that the cancer had a wonderful opportunity to grow. He expressed the view that the primary cancer was in the middle portion of the adrenal glands and based this opinion upon the fact that the adrenal gland is more subject to the effect of trauma than the other areas of the body indicated; and, "it is a definite fact that trauma speeds the growth of cancer," and that in this case the man received a trauma and now it has spread to almost the entire body; that when cancer "reaches a spot that has been devitalized, there is where it stays and sets up its growth."

We have carefully considered all of the medical testimony (consisting of approximately 350 transcript pages) in the light most favorable to plaintiff and have concluded that it is sufficient from which a jury could reasonably have found that the blow to Mr. Heppner's head caused an abscess in his brain, and that the blow to his back activated a pre-existing dormant cancerous condition in the adrenal gland and caused it to spread and become manifest in the brain abscess or capsule described in the evidence, and that these cancerous conditions caused his death. While the evidence of Drs. Nigro and Graham is not as definite in some respects as it perhaps should be, we think that their testimony did constitute substantial evidence and, when considered in connection with the fact that repeated tests did not disclose cancer cells in the abscess prior to November 13, was sufficient to support the submission complained of.

Defendant also contends that said Instruction No. 1 was erroneous because "it fails to require the jury to find that the defendant caused the lurch and jerk, it gives the jury a roving commission and permitted them to guess and speculate upon the cause or responsibility for the lurch or jerk." With reference to this point it may be stated that the instruction required a finding "that when said caboose reached said point it gave a sudden unexpected, violent, and unusual forward jerk and lurch * * * and that John O. Heppner,

by said \* \* \* unusual forward jerk and lurch of said caboose received injuries to his back and head, \* \* \* then you are instructed that such facts (if you believe them to be true) are sufficient circumstantial evidence to warrant a finding by you that the defendant was negligent, and you may so find, unless you find and believe from other facts and circumstances in evidence that the occurrence was not due to defendant's negligence, and if you do find and believe from all of the evidence in the case that the defendant was negligent, \* \* \* and if the jury further believe from the evidence that the death of John O. Heppner resulted in whole or in part from negligence, if any, of the defendant as above mentioned \* \* \*."

As stated, defendant complains of the fact that the jury was not specifically required to find that defendant caused the train to jerk. Cases are cited, Boulos v. Kansas City Public Service Co., 359 Mo. 763, 223 S.W.2d 446, and Vesper v. Ashton, 233 Mo.App. 204, 118 S.W.2d 84, in which such a phrase was used in somewhat similar instructions. However, we find nothing in those cases to ʼindicate that it is essential that this element must be specifically submitted in every such instruction. In the instant case we think a finding that defendant caused the train to lurch is necessarily implied from the other findings required.

This being a res ipsa loquitur case plaintiff did not attempt to prove the occurrence which caused the train to lurch. There was no dispute about the fact that defendant's employees were in control of the train and hence the jury was permitted to find negligence from the fact that there was an unusual, unexpected jerk which caused decedent's injuries. However, the jury was required to specifically find that defendant was negligent and that the death of Mr. Heppner "resulted in whole or in part from negligence, if any, of the defendant as above mentioned." Under the evidence and submission in this case we are unable to understand how the jury could have found that defendant was guilty of negligence which caused Heppner's injuries and death without necessarily finding that the defendant caused the unusual jerk. That was the only act submitted as a circumstance upon which the jury could predicate a finding of defendant's negligence. Under these circumstances it would seem that simple logic would require a conclusion that the jury could not have found defendant negligent without a finding that defendant negligently caused the lurch. We rule that the omission complained of did not constitute prejudicial error.

The next point briefed relates to the hypothetical questions propounded to plaintiff's expert witnesses, Dr. Nigro, Dr. Graham and T. J. Coulter, which questions are said by defendant to be "erroneous since they assumed facts not in evidence, omitted material facts, called for speculation, guess, and conjecture, and were too lengthy and garbled for an intelligent understanding." In the question to Dr. Nigro complaint is made concerning the portion thereof which assumes that Heppner "was· riding in the cupola of the caboose of said train in which position trainmen customarily rode with their backs toward a padded back rest as shown in plaintiff's Exhibit No. 4 which I now show you, doctor, with some recess from the top thereof to a glass window in the back of the caboose cupola; and that said caboose at that time gave an unexpected and severe and violent forward lurch or jerk with the result that John Heppner was thrown backward so that the small of his back in the region of the kidneys was struck or thrown against the cupola with such force and violence that John Heppner's head was caused to go back and break and knock out said glass window cutting the side of his head and the top thereof \* \* \*." It is said that there is no evidence to support the facts therein hypothesized and therefore reversible error was committed in overruling the objection thereto and permitting the question to be answered.

506

We have heretofore ruled that that there was evidence that the jerk was unexpected and severe. As to the other facts hypothesized we may say that it is not necessary that they be proved by the direct testimony of an eyewitness. Facts may be included of which there is substantial circumstantial evidence. Pettis v. St. Louis Public Service Co., Mo.Sup., 240 S.W.2d 909. In the instant case there was evidence that trainmen customarily rode with their backs toward the rear window of the cupola; that the caboose gave an unusual forward lurch which would tend to throw a person toward the rear; that at the time of the lurch the rear glass was broken; that shortly thereafter Heppner came down from the cupola and had a bleeding cut on his head and a corresponding cut in his cap; and that when he went home that night he had a "welt" across his back. We think this was sufficient circumstantial evidence from which the jury could reasonably have found all of the assumed facts and hence it was not error to include them in the question.

We see no merit in the contention that the hypothesized question propounded to Dr. Nigro (which covers three pages in the transcript) is so long and unwieldly that it was beyond comprehension. We have carefully read it and can see no reason why it could not have been fully understood by the witness and the jury. The hypothetical question which was propounded to Dr. Graham was very similar to the one submitted to Dr. Nigro. Therefore, the foregoing will dispose of the alleged errors in regard to the testimony of Dr. Graham.

Plaintiff's expert, Coulter, examined the plat of the track and was asked a hypothetical question which detailed certain assumed facts relating to the speed of the train and the force and effect of the jerk in question. In answer to the question he stated that he could see no reason for any jerk at the place where the instant jerk occurred. In response to another question he stated that if he had been in the cupola of the caboose on the night in question and had anticipated the jerk he could have guarded against it. He testified further that "any time that you don't anticipate a jerk or a slack of any kind, you are sitting relaxed, then you get bounced around."

The objections made to the first question were that it assumed facts not in evidence and invaded the province of the jury. We see no merit in either objection. As we have indicated, in ruling on objections to other hypothetical questions, there was circumstantial evidence to support the facts hypothesized. As to the second objection we think it clear that the cause of "slack action" and resulting jerks on freight trains, as well as the conditions under which jerks are to be expected, are matters about which the average person has little knowledge or understanding and it would therefore appear to be a proper subject for expert testimony.

As to the other two questions asked Coulter, it is said that to permit him to testify that had he been in the cupola he could have guarded against the jerk if he had anticipated it, and would have been "bounced around" if he had not, is "calling for the wildest and purest kind of speculation." We do not think the trial court erred in overruling the objection made. According to the evidence, jerks and lurches are often experienced by trainmen riding in the caboose. Therefore, it is certainly not speculative for a trainman of eighteen years' experience to state that he could guard against an anticipated jerk and would be "bounced around" by one he did not expect. It is also said that the witness could not have known the degree of the violence of the jerk because he was not in the caboose. The answer to that assertion is that the witness was an expert, and facts (supported by the evidence) concerning the degree of violence and the effect of the jerk were hypothesized in the first of this series of questions.

The final point briefed relates to alleged error in the admission of certain testimony

by plaintiff's witness, Hugh H. Magers, a public actuary. It was agreed that the take-home pay of Mr. Heppner during the last twelve months that he worked was $3,519.19. A Mortality Table was admitted in evidence which showed the life expectancy of a man 57 years old (Mr. Heppner's age) to be 16.43 years. Based upon these figures Mr. Magers testified that the present cash value of decedent's expected earnings was $51,183. Defendant contends that the admission of this actuarial computation was error because it was based upon the entire take-home pay of Mr. Heppner rather than on the net pecuniary benefits the widow would reasonably expect to receive during the period of expectancy.

■ There can be no question but that plaintiff could recover only her pecuniary loss. Crabtree v. Kurn, 351 Mo. 628, 173 S.W.2d 851. Plaintiff was not entitled to recover the present cash value of the total amount of take-home pay which would have accrued to deceased during his life expectancy. Her recovery upon this item is limited to the present cash value of the future pecuniary benefits of which she was deprived because of her husband's death. She testified generally that about $200 per month was the portion of his wages that was used for her benefit. Upon her cross-examination it was brought out that decedent had personal expenses totaling about $150 per month and hence it appeared that the remaining amount available for her use would have been a little less that $150 per month. Obviously, in order to determine the amount of plaintiff's pecuniary loss, it was necessary for the jury to either accept her affirmative testimony that $200 per month was used for her benefit or deduct from decedent's total take-home pay the amount of his personal expenses, as such would not have been a pecuniary benefit to her.

It would not require the services of an actuary or expert mathematician to compute the amount of either the anticipated future earnings of Mr. Heppner or the total of the future benefits to plaintiff, based upon his life expectancy as shown by the mortality table in evidence. However, it was also necessary to reduce the amount of the future pecuniary benefits to its present cash value. That required a more complicated computation which takes into account the earning power of money.

The amount of decedent's take-home pay and the length of his life expectancy were properly in evidence. All that the actuary did, in producing the testimony complained of, was to multiply one of these items by the other (thus obtaining the total expected take-home earnings) and to reduce the amount so obtained to its present value. Since that figure did not represent the ultimate measure of damages the computation was, at least, incomplete. If the witness had been required to assume the correctness of certain testimony relating to the amount of the expected future benefits of which plaintiff had been deprived and upon so determining that amount, to have reduced it to the present cash value thereof, his testimony would no doubt have been of more assistance to the jury.

■■ However, we are unwilling to say that the testimony complained of was wholly irrelevant and hence inadmissible. Although incomplete, it was a computation made from elements which were properly before the jury. It is the province of the jury to determine the amount of damages and, in so doing, it may consider various relevant elements in evidence. "As the courts have frequently said, the amount of damages to be awarded in this class of cases is necessarily speculative to a large extent and many elements and contingencies enter into the calculation, if indeed it can be called a mathematical calculation. Certain general rules may be given for the jury's guidance, as was done here, and certain basic facts, such as the approximate net earning power of money and the life expectancy of the deceased, his earning capacity at the time of

508

his death, and all the contributions he was then and had been making to plaintiff or the beneficiary, are properly put in evidence, together with certain inclusions and exclusions, but these are mere guides and matters for the jury to consider in exercising a sound judgment." Goyette v. St. Louis-San Francisco Ry. Co., Mo.Sup., 37 S.W.2d 552, 556. If the jury desired to use the figure stated by the actuary and deduct therefrom the amount of decedent's personal expenses, it likely could (along with the use of other elements and contingencies) have arrived at a fairly accurate sum as the amount of the present cash value of the total future pecuniary benefit of which the widow was deprived.

Moreover, even if it should be assumed that it was error to admit the questioned evidence, we are convinced that such was not prejudicial and hence would not require a reversal. In this connection it should be noted that plaintiff's measure of damage instruction correctly told the jury that if the jury found for plaintiff it should assess a reasonable amount for the conscious pain and suffering of decedent and "such further sum as you may find and believe from the evidence is the present cash value of the future pecuniary benefit, if any, of which you may find and believe from the evidence the widow is deprived by the death of John O. Heppner, according to the circumstances in evidence, making adequate allowance for the 'earning power of money.'" As indicated, plaintiff testified as to the amount of decedent's contributions for her benefit and as to the various items of Mr. Heppner's living and personal expense. The testimony of Mr. Magers was quite clear as to the figures used by him and that his computation did not constitute the present cash value of plaintiff's pecuniary loss. This was indicated by the court a number of times (in the presence of the jury) in its rulings on objections, as, for example, the following: "The court: Of course, the recovery, if any, would be the pecuniary loss. This would be some evidence [of]

what her loss might be based on." Moreover, the witness repeatedly stated that he used only the amount of the take-home pay and the life expectancy in arriving at his computation. That he did not take the items of personal expense into account was made very clear to the jury by the following cross-examination:

"Q. It is in evidence here that he [Heppner] took out $60.00 a month for his expenses while on the road. Your computations do not deduct that amount from your figures, do they? A. I have no knowledge of that at all.

"Q. It is in evidence here, Mr. Magers, that his clothing expense amounted to $15.00 a month. That is not deducted from your computations, is it? A. It didn't enter into my computation.

"Q. It is further in evidence here that the rent was $40.00 per month at the apartment where Mr. and Mrs. Heppner lived. You didn't take that figure into consideration in your computation? A. It isn't a part of my computation so far as I know.

"Q. There is evidence here about the expense of groceries per month, I think $100.00 or $120.00 per month. Your calculations did not take that into consideration, did they? A. I didn't know anything about it at all."

In view of the foregoing we think the jury understood that the figure the actuary arrived at, i. e. $51,183, was not the present cash value of plaintiff's pecuniary loss. In this connection it should be noted that defendant offered no actuarial testimony on the issue of damages. The verdict of the jury was for $27,500, some $23,683 less than the figure stated by the actuary, and the amount returned by the jury may have included damages for the conscious pain and suffering of the deceased. It would therefore seem apparent that the jury was not misled by the testimony of the actuary

but, on the contrary, followed, as best it could, the law as contained in the court's damage instruction.

The judgment is affirmed.

VAN OSDOL, C., concurs.
COIL, C., concurs in result.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur except WESTHUES, J., who concurs in result only and adopts memorandum of COIL, C., as his separate opinion.

WESTHUES, Judge (on concurrence in result).

COIL, Commissioner. After examining the motion for rehearing, and after having given the matter further consideration, I have concurred in result only for the reason that I do not agree that the actuary's expert testimony as to the present cash value of deceased's total future take-home pay was admissible. I think it was clearly irrelevant and inadmissible for any purpose. The reason seems obvious. The witness was an expert—the only purpose he served was to state the one fact, viz., present cash value of deceased's total future take-home pay. That was a fact or figure which the jury was not entitled to have before it. It might well have been, under other circumstances, a misleading and prejudicial figure. It was admitted with the trial court's approval and, indeed, with the trial court's statement that the figure "would be some evidence of what her loss might be based on." Now that statement, in my opinion, was not accurate. The present cash value of deceased's total future take-home pay was

not evidence "of what her loss might be based on." On the contrary, the present cash value of total take-home pay could not have entered into any proper calculation or conclusion the jury might make or reach.

I respectfully suggest that the writer of the principal opinion, holding the expert's conclusion admissible, has fallen into the error of having failed to distinguish between the admissibility of the *facts* or elements on which the conclusion was based and the admissibility of the conclusion itself. That is to say, while deceased's total take-home pay was independently admissible as a starting point for further calculations, and while the earning power (rate) of money was admissible as a separate evidentiary item, still the conclusion based on those facts as to the present cash value of deceased's total future take-home pay was a wholly different thing. It is only that conclusion with which we are presently concerned. We are not concerned with the separate and independently admissible facts from which the inadmissible conclusion was drawn.

I do agree, however, that the circumstances of the present case demonstrate the nonprejudicial effect of the expert testimony. Nevertheless, we should unequalifiedly hold the expert's conclusion inadmissible. To hold that testimony admissible in this case is to invite the practice of placing before a jury in F.E.L.A. cases irrelevant, large figures which will, in many, if not in most, instances, be highly prejudicial. The principal opinion outlines and sanctions a future practice which, in my view, cannot logically find support within the basic rules of evidence.

I would, therefore, hold the questioned testimony inadmissible but nonprejudicial in this particular case.